**Larry CORLEY, Appellant,**

v.

**STATE of Indiana, Appellee.**

**No. 383S106.**

Supreme Court of Indiana.

Nov. 23, 1983.

Martin W. Kus, LaPorte, for appellant.

Linley E. Pearson, Atty. Gen., John D. Shuman, Deputy Atty. Gen., Indianapolis, for appellee.

DeBRULER, Justice.

This is an appeal from the denial of a motion to dismiss and a petition for writ of habeas corpus predicated on the prohibition of the Fifth Amendment to the United States Constitution and Art. 1, § 14, of the Indiana Constitution against double jeopardy.

The trial of petitioner on a charge of dealing in a Schedule II drug commenced before a jury on February 9, 1983. The main witness for the prosecution was state police trooper King who testified under questioning by the prosecutor Chapala that while assigned to an "Uncle" team, part of a clandestine police operation, she purchased drugs from petitioner for money. Additional questions by Chapala brought out that "Phase IV" of the "Uncle" operation was conducted in the LaPorte County area, and had culminated in the arrest of 107 persons. Ruling that the questions by the prosecutor about the operation had "opened the door," defense counsel Kus was permitted over objections to cross-examine on the subject. This cross-examination brought forth statements by the trooper that she was personally involved in 43 of the 107 arrests, and that in the course of that operation her physical contact with those arrested had been minor and limited to sitting or standing by them and dancing, that an occasional touch on the shoulder had occurred, but she did not hold hands or permit anyone to brush up against her.

During a brief recess in this first day of trial, defense counsel Kus was approached in the courtroom by a new and youthful local lawyer by the name of Bom, who had heard some of the testimony of the woman trooper. He told Kus that he had a client, James Allison, who might have some useful information regarding her testimony and that if interested Kus should contact him. Allison had recently pleaded guilty to possession on a charge of dealing in a similar case in which the woman trooper had been active.

In the afternoon of this first day of trial, the prosecution rested its case-in-chief and defense counsel Kus made a motion for a directed verdict of acquittal on the basis that the State had failed to show his client's predisposition, thereby referring to the defense of entrapment. In argument the prosecutor took the position that the issue of entrapment was not present and that he was surprised at the suggestion. The trial court denied the motion. The trial was then adjourned for the remainder of the afternoon, to resume the following morning. The prosecutor was furnished with the name of James Allison as a potential witness, and later that day he met with Kus, Bom and Allison.

On the following morning, February 10, 1983, prosecutor Chapala presented a motion in limine to the trial judge requesting an order to defense counsel and all defense witnesses to abstain from "directly or indirectly" referring to or presenting evidence of any sexual activities of the trooper with any person other than the defendant, without first approaching the bench and informing the court outside the hearing of the jury of the intention to broach the subject. The motion in limine was sustained.

The first witness called by the defense was attorney Bom who was responding to a subpoena delivered by Kus. Before a single question was asked, the prosecutor was permitted, (in the trial judge's mind for the purpose of preventing undue surprise), to

question the witness under oath as to any relevant evidence he might have. The prosecutor complained that he had not known Bom would be called as a witness and objected that he had had no opportunity to take a deposition of Bom. The prosecutor was permitted to examine the witness outside the presence of the jury. This examination covers more than twenty pages of the transcript before this Court and it reveals no more than two areas of knowledge, namely, the prior statements of his client Allison concerning physical contact with the trooper and his personal knowledge of what he viewed as threats made by the prosecutor at the previous day's conference to deter Allison from testifying. Regarding the two areas of knowledge, Bom testified in part under questioning by Chapala outside the presence of the jury as follows:

"A. Uhh, I know that he [appellant] was charged with Dealing in a Controlled Substance, uh, three (3), I believe three tablets, three pills.

Q. Did you witness any of that transaction?

A. No, I did not.

Q. Do you know anyone that had witness [sic] that transaction?

A. No, I do not.

Q. So, what do you know about this particular case?

A. I have information that would show uh, that one of the State's witnesses, in regards to Mr. Corley was not speaking what appeared to be the truth.

Q. Did your witness, Mr. Allison, uh, what did he tell you?

A. In regards to what?

Q. In regards to whether or not one of the State's witnesses was speaking the truth?

A. He related to me that, in fact, what she had spoken was far from the truth.

\*　　\*　　\*　　\*　　\*　　\*

Q. Is that what you are prepared to testify about today?

A. I think that the real thrust of what I am prepared to testify is that my client has information that bears on her testimony that he voiced an intention to testify to those facts. And, that both my client and myself were threatened, if you will, by the state, if we did testify.

Q. You consider that a threat?

A. Yes, I do.

Q. So, any information that you have about Trooper King is coming from your client, Mr. Allison, is that correct?

A. My client would testify to . . .

Q. But you don't have any independent information about the truth or veracity of Trooper King?

A. Based only on what my client has told me.

Q. Okay. You have not met her, you have not talked to her, you don't even know her, do you?

A. Yes, I know her. I was introduced to her yesterday.

Q. But, independent of your client's statements to you, you can say nothing, first-handed, about her truth or veracity, is that correct?

A. No, I can't.

Q. Do you know anything else about this case other than, uhh, what your client told you in regard to Trooper King?

A. Do I know anything more about Trooper King, or anything more about . . .

Q. (Interrupting) About this case?

A. Only that he volunteered to witness as a defense witness and was intimidated and threatened by the state. And, I was present when those threats were made."

At the conclusion of this examination the prosecutor Chapala made a verbal motion in limine to "preclude this witness (Bom) from testifying." The record of proceedings discloses the ruling on this motion and subse-

quent events which led to the complete breaking off of the trial.

"Court: What is your motion?

Mr. Chapala: I made a motion in limine to preclude this witness from testifying.

Court: I can't preclude the witness from testifying but he is certainly not going to be able to testify as to anything his client told him about the client's relationship with Mrs. King or as to what happened in the hall, yesterday. It has nothing to do with this case; but, if Mr. Kus wants to call him, I can't stop him, if you [are] satisfied with the surprise.

Mr. Chapala: I understand, your honor, that he can't (sic) call him as a witness but the questions that will be asked I think would be prejudicial.

Court: Well, I don't know what questions he's going to be asking yet.

Are we ready for the jury?

Mr. Kus: Your honor, one thing, uh ... one statement so I do know it ... as I understand the law in preserving an error on a ... that's required to preserve error in sustaining a Motion in Limine, or overruling it, according to *Estate of Ballard v. Ballard* and that's cited at [Ind.App.] 434 N.E.2d 136, an offer to prove is required to preserve errors in sustaining a Motion in Limine. And, as I understand it, I will ask the questions and, of course, pursuant to this court's Motion in Limine, uh, that I have objected to, when I get to a point where it is going to touch those issues, I will respectfully request side bar, ask the court to dismiss the jury so I can make my offer to prove in the record and preserve my ...

Court: If you want to make your record now in absence of the jury it is perfectly all right with me. If you are going to ask this witness anything about his client's relationship to Mrs. King, that testimony will be kept out. I will not let it in.

Mr. Kus: I understand ... how about, your honor, I'm going to ask him or

this is what I hope to ask him ... uh, did he approach me with information that there may be a witness that had relevancy in this case.

Court: Well, it ...

Mr. Kus: (continuing) nothing to do with sexual ...

Court: Well, as I understand it, that witness would be Mr. Allison, is that right?

Mr. Kus: That's right.

Court: Mr. Allison, as a witness, has no testimony that would be relevant to this case if his only testimony is he had some relationship with Mrs. King.

Mr. Kus: Okay. And, Mr. Bom's testimony concerning the prosecutor's conduct in this case, the same ruling?

Court: The prosecutor's conduct out in the hall, yesterday?

Mr. Kus: And behind closed doors concerning ...

Court: That happened yesterday?

Mr. Kus: Yes.

Court: That has nothing to do with the issues that this jury has to decide.

Mr. Kus: Then, yes, I would like to go ahead and make my offer to prove ...

Court: You may do so.

Mr. Kus: I would have no objection to having the jury released for lunch, now, and then I'll make my offer ...

Court: Okay.

Mr. Chapala: Before we ... at this time, your honor, uh, I've changed my mind about my interrogation of Mr. Bom, and I would like an opportunity to take his deposition and would request at this time a continuance of these proceedings until I have an opportunity to depose him. I believe I have not thoroughly enough interrogated this man. I do this with deep regret to the court but I feel compelled to do it at this point, to ask for a continuance, this witness was not known to me until he took the stand this morning, that he would testify in this particular cause. And, I believe that it's proper at this point at for, the only recourse I have would be to request a continuance to

give me sufficient time to do proper and appropriate discovery.

Court: Are you talking about a continuance of the case, this case here?

Mr. Chapala: Yes, your honor.

Court: And I can discharge the jury?

Mr. Chapala: I believe you would have to, your honor.

Court: Okay.

Mr. Kus: Your honor, I will make my objection for the record. I object to it, uh, the continuance at this time.

(JURY CALLED INTO OPEN COURT AND EXCUSED FROM FURTHER DUTY IN THIS CAUSE OF ACTION.)

(After Jury Discharged, Prosecutor/Defendant & Counsel appear before the court and make the following record.)

Mr. Kus: For the record, my client is now present in court.

I would object to the continuance on the grounds it violates the due process rights for the defendant as guaranteed by the First, Fourth, Fifth and Eighth Amendments of the Constitution, as guaranteed by the Fourteenth Amendment of the United States of America. I also base my objection on it as a violation of the rights guaranteed by the Constitution of the State of Indiana. The rights, pursuant to statute, to speedy trial, I would say for the record my client is ready willing and able to go to trial at this time, and has not requested a continuance and objects to the continuance for the record. I appreciate the court taking this time out for me to bring my client back to make the objection.

Mr. Chapala: I have no comments, your honor."

The order book entry of the court for February 10, 1983, reflecting these trial events reads as follows:

"The duly sworn jury appears together with each of the parties by their respective counsel.

Before the introduction of the defendant's evidence, the State orally moves for a continuance on grounds of surprise witness. Defendant orally states his objec-

tions to the continuance. State's motion is granted. The jury is discharged from any further service in this cause of action.

The defendant is remanded to the sheriff's custody. DATED this 10th day of February, 1983.

s/   Robert S. Gettinger
JUDGE, LA PORTE CIRCUIT COURT

CC:  Walter P. Chapala
       Martin W. Kus"

Following the discharge of the jury on the 10th of February, 1983, the order book reveals that the trial judge rescheduled the case for trial by jury for March 22, 1983 and notices were mailed.

On February 15th, petitioner filed a petition for writ of habeas corpus and on February 16th, filed a motion to dismiss, on the basis that a retrial would be barred by the previous presentation which ended on February 10th through application of the due process, speedy trial, and double jeopardy provisions within Art. I, § 14, of the Indiana Constitution, the Fifth and Fourteenth Amendments to the United States Constitution and § 35-41-4-3.

In an order dated February 28, 1983, the trial judge entered an order denying the application for writ of habeas corpus and the motion to dismiss, and continued the trial to permit an interlocutory appeal of the ruling. In so doing the court's reasoning appears as follows:

"The court being duly advised in the premises finds that the defendant's Motion to Dismiss should be denied and further that the Writ of Habeas Corpus should be denied for the reason that the State's right to take depositions prior to trial would have been effectively denied without a continuance.

Comes now the defendant and orally moves to take an Interlocutory Appeal of this matter. Request granted. The court further finds that the trial set for the 22nd day of March, 1983 should be continued to allow the defendant an opportunity to perfect his interlocutory appeal."

Appellant contends in this appeal that the trial court should have dismissed the charge upon his motion because a new trial would place him twice in jeopardy for the same offense. The State responds that appellant's failure to object to the discharge of the jury constituted a waiver of his jeopardy claim and secondly, that there was manifest necessity for the discontinuance of the trial.

The Bill of Rights to the United States Constitution and the Bill of Rights to the Indiana Constitution guarantee that no person shall be placed twice in jeopardy for the same offense. Indiana Code § 35-41-4-3 is the Indiana statute in furtherance of this basic guarantee. The right enjoyed is personal and fundamental but can be waived, where, for example, the defendant consents to a retrial for the same offense. And the judge governing the trial may solely order the trial discontinued after jeopardy has attached, if required by "manifest necessity" or the "ends of public justice." *Illinois v. Somerville,* (1973) 410 U.S. 458, 93 S.Ct. 1066, 35 L.Ed.2d 425.

The case of *United States v. Perez,* (1824) 9 Wheat. 579, 6 L.Ed. 165, remains basic. It sets the proper course for judges when considering whether to break a trial off after jeopardy has attached by the swearing of the first witness in a judge trial or the impaneling and swearing of the jury in a jury trial. The United States Supreme Court stated:

"We think, that in all cases of this nature, the law has invested Courts of justice with the authority to discharge a jury from giving any verdict, whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated. They are to exercise a sound discretion on the subject; and it is impossible to define all the circumstances, which would render it proper to interfere. To be sure, the power ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvious causes; and, in capital cases especially, Courts should be extremely careful how they interfere with any of the chances of life, in favour of the prisoner. But, after all, they have the right to order the discharge; and the security which the public have for the faithful, sound, and conscientious exercise of this discretion, rests, in this, as in other cases, upon the responsibility of the Judges, under their oaths of office." 9 Wheat. at 580.

The requirements for the exercise by the court of the power to discontinue a trial in conformance with this basic right are summed in the words "the power ought to be used with greatest caution, under urgent circumstances, and for very plain and obvious causes." The protection exists only so long as courts restrict their exercise of the power to extraordinary circumstances. Our statute identifies several categories meeting the requirement, i.e., physical impossibility to proceed with the trial, a legal defect rendering any judgment reversible as a matter of law, and prejudicial misconduct rendering it impossible to proceed without injustice.

In the case before us the trial court ruled on the motion of the prosecutor to continue the case, after announcing that such a motion if granted would require the jury to be discharged because of a congested court calendar. All present were aware of this announcement. When therefore, the defendant through counsel objected to the continuance, all present knew that he was likewise objecting to its announced consequences. There is therefore no validity to the State's threshhold argument on appeal that there was a waiver here of double jeopardy protection for failure of the defendant to properly assert his jeopardy claim.

In light of the governing words of the *Perez* case, we have examined the circumstances of the case before us. The trial judge in continuing the case on motion of the prosecution and in discharging the jury, did so in order to afford the prosecutor the opportunity to take a formal deposition of

the "surprise" witness attorney Bom. There is no doubt that the right of a party to take a deposition of the witnesses of his opponent is a significant one. Through this procedure the examining lawyer through skill and guile may be able to wrest from the subject that which he might testify to at trial. The deposition may become useful as substantive evidence at the trial, or may serve as a basis for impeachment. But is that interest and need of the prosecutor in this case, to take a formal deposition of attorney Bom, one which is extraordinary, urgent, and necessary to the "ends of public justice", *United States v. Perez, supra*? Clearly not. In the first place, the trial court granted the prosecutor the opportunity to question the witness outside the presence of the jury. The prosecutor took full and unfettered advantage of this opportunity, and his efforts cover twenty-six pages of this transcript. He successfully corralled the potentially pertinent and harmful information which the witness had. In addition, the trial court actually ordered the exclusion of the testimony of Bom and his client Allison regarding the conduct of Trooper King and the conduct of the prosecutor himself. In addition and furthermore, the prosecutor himself had first-hand knowledge of all that was done and seen at the conferences, as he was a participant in them. And finally, the trial court did not inquire what additional pertinent questions the prosecutor might have to put to attorney Bom in the course of a future deposition. And the prosecutor suggested none on his own. In sum, the record provides no support for the need of the prosecutor to take a formal deposition of attorney Bom. Instead the record supports the proposition that the prosecutor through alternative means, had already received that benefit which the right to depose a witness is intended to provide the deposition taker.

In conclusion it cannot but be concluded that there was no manifest necessity under the circumstances of this case for granting the motion of the prosecutor to take a deposition of Bom and in discharging the jury. Another trial of appellant therefore of this alleged offense is forbidden by the Bill of Rights. The judgment of the trial court is reversed and the case is remanded to grant the motion to dismiss and to discharge the defendant.

HUNTER and PRENTICE, JJ., concur.

PIVARNIK, J., concurs in result.

GIVAN, C.J., dissents without opinion.