Thomas BROWN, Appellant
(Defendant Below),

v.

STATE of Indiana, Appellee
(Plaintiff Below).

No. 82S00–9609–CR–603.

Supreme Court of Indiana.

Dec. 3, 1998.

Timothy R. Dodd, Evansville, for Appellant.

Jeffrey A. Modisett, Attorney General, Suzann Weber Lupton, Deputy Attorney General, Indianapolis, for Appellee.

BOEHM, Justice.

Thomas Brown appeals his conviction for murder contending that: (1) the trial court granted a mistrial under circumstances that rendered his second trial a violation of the Double Jeopardy Clause of the United States Constitution; (2) evidence of a prior conviction for "burglary" in Illinois did not constitute "burglary" in Indiana and so was erroneously admitted pursuant to Indiana Evidence Rule 609(a); and (3) the trial court erred in refusing his instructions on the lesser included offenses of voluntary manslaughter and reckless homicide, and the defense of voluntary intoxication. We affirm the trial court.

## Factual Background

Brown, a tall man in his early twenties, admits that in December 1995 he stabbed and killed Sterling Hall, a sixty-one year old man with a disabled lung, in Hall's Evansville apartment. At trial, his contention was that the killing occurred in self defense.

### Undisputed facts

On the day of the killing two strangers, both men, approached Brown at a shopping mall asking for marijuana. Brown took eight dollars from the men, parked them at his girlfriend's apartment, and left to find some marijuana. On the way, Brown met a friend and together they purchased cocaine, which they promptly smoked, with ten dollars Brown had obtained from his girlfriend earlier in the day. Brown then met another friend, Derrick Jones.[1] Brown and Jones, in search of additional funds, identified Hall as a potential buyer of a television set and Brown's girlfriend's apartment as a potential source. The two arrived at Hall's apartment where Hall said he was interested but want-

---

1. Brown says, but Jones denies, that with Jones' two dollars and Brown's eight they purchased and smoked ten dollars worth of cocaine.

ed to have a look at the television first. Brown left the apartment, and returned to his girlfriend's where he appropriated her cousin's television. He told the two men—still waiting for their marijuana—that he was going to get it for them.

When Brown returned with the television Hall agreed to buy it if he could pay part of the purchase price up front and part at an undefined time in the future, perhaps only a matter of one half hour. Brown accepted fifteen dollars as a down payment and promptly applied these funds to cocaine which he smoked with yet a third friend. About half an hour later, Brown returned to Hall's apartment seeking the balance of the purchase price of the television set. When he left the apartment Hall was dead. Brown stabbed Hall twenty-two times—sixteen times in the hands and six times in the neck. A pathologist testified that all of the stab marks on Hall's hands were defensive wounds indicating that Hall was attempting to fend off an assault. The wounds to the throat were fatal.

*Brown's account of Hall's death*

The following is Brown's account of the events during his second visit to Hall's apartment. Hall invited him into the apartment and Brown sat at the kitchen table. When Brown asked for the remainder of his money, Hall suddenly became hysterical, made angry gestures, and placed his hand close to a knife which lay on the table. The discussion became increasingly animated and Hall asked Brown to leave the apartment. Brown said he would go, but that he still wanted his money. As Brown was departing, he turned back to see Hall charging him with the knife. Brown upended Hall and again attempted to leave, but Hall recovered and once more, with surprising strength, lunged at Brown with the knife. Brown wrestled the knife away from Hall and began hitting him repeatedly. Eventually Hall fell limply to the ground. Brown then panicked. He saw his clothes were covered in blood, so he shed his jacket and pants, donned Hall's trousers, and left the apartment, leaving his own clothes

behind. Brown returned again to the girlfriend's apartment to find his two patient customers still waiting, now in the company of Brown's girlfriend and uncle.[2]

*Testimony from other sources*

That evening, Brown told his uncle that he thought he had killed someone. He fled to Arkansas the next day. Three days later the police discovered Hall's body. Police identified Brown from the items of clothing left in the apartment and traced him to Arkansas where he was arrested. Brown agreed to return to Evansville where he admitted the killing but insisted it was in self defense. Subsequently, the police learned of discrepancies in Brown's statement. For example, he claimed not to have taken Hall's wallet, but the police found the wallet in a pocket of Brown's abandoned trousers. Brown later admitted to taking the wallet. Brown also contended that he did not see or speak to Jones as he left Hall's apartment. However, a witness at trial testified that he saw a man fitting Brown's description leave the apartment and speak with Jones, who had knocked on Hall's door. This occurred shortly after the witness heard a moan from someone apparently in pain inside the apartment. In addition, Brown's girlfriend testified that when she returned from work, she found that her door had been "kicked in" and that the television was missing. Brown had said that the door was "open." The girlfriend also testified that Brown later said that he had been in a fight over drugs and money. Another witness testified to the same effect.

The jury convicted Brown of murder and the trial court sentenced him to sixty-five years in prison. This appeal followed.

## I. Double Jeopardy

The first trial began in March 1996 after the jury had been sworn and jeopardy had attached. *Livingston v. State*, 544 N.E.2d 1364, 1366 (Ind.1989) (a defendant is in jeopardy when the jury is sworn). After Brown's opening argument, a juror, Tyrone Edwards, contacted the trial court expressing concern

---

**2.** Brown's uncle testified that the two strangers left the apartment shortly after he arrived, and

that they were not present when Brown arrived.

that his role as a minister at a local jail would affect his ability to be an impartial juror. The next day, the court held a hearing with Edwards and counsel for both sides present. In response to questions from counsel, Edwards told the court that he was a volunteer minister at the jail counseling inmates. He was concerned that serving on a jury and rendering a guilty verdict could compromise his position as a minister and even potentially his safety. Edwards did not remember disclosing his ministry service on the juror questionnaire, and there is no indication from the record that the State knew of Edwards' ministerial work.

After Edwards returned to the jury room, the court and State agreed that Edwards posed a problem to the impartiality of the jury. Brown's attorney acknowledged that Edwards was "between a rock and a hard place. He either has to be a juror or a minister and he can't be both." The State suggested continuing the trial with eleven jurors.[3] Brown's attorney responded equivocally, but indicated that his consent would probably not be given. Later that same day, the State moved for a mistrial. Brown objected and the court granted the motion based on Edwards' testimony. Brown then moved to dismiss the charges against him on double jeopardy grounds. Brown unsuccessfully renewed his motion to dismiss after a second jury was sworn and prior to commencement of the second trial.

 Brown contends that both the Double Jeopardy Clause of the Fifth Amendment to the U.S. Constitution and Article I, § 14 of the Indiana Constitution barred Brown's retrial.[4] The Fifth Amendment prevents the State from placing a defendant in jeopardy twice for the same offense. *Benton v. Maryland*, 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969). Once jeopardy has attached, the trial court may not grant a mistrial over a defendant's objection unless "manifest necessity" for the mistrial is found. *Arizona v. Washington*, 434 U.S. 497, 505, 98 S.Ct. 824,

54 L.Ed.2d 717 (1978). In the absence of manifest necessity discharge of the jury serves as an acquittal. *Wright v. State*, 593 N.E.2d 1192, 1196 (Ind.1992). The standard for manifest necessity dates to Justice Story's classic formulation in *United States v. Perez*, 22 U.S. (9 Wheat.) 579, 6 L.Ed. 165 (1824). Under *Perez*, trial courts are authorized to discharge a jury:

> whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated. They are to exercise a sound discretion on the subject; and it is impossible to define all the circumstances which would render it proper to interfere. To be sure, the power ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvious causes.

*Id.* at 580, 6 L.Ed. 165. As the Court elaborated in *Arizona v. Washington*, 434 U.S. at 506, 98 S.Ct. 824, 54 L.Ed.2d 717, these words "do not describe a standard that can be applied mechanically or without attention to the particular problem confronting the trial judge." "Necessity" is not to be interpreted literally. There need be only a "high degree" of necessity before concluding that a mistrial is appropriate. *Id.* An explicit finding of manifest necessity is not required. Rather, the record need only "adequately disclose" the basis for the trial court's decision. *Id.* at 516–17, 98 S.Ct. 824, 54 L.Ed.2d 717. The decision of the trial court to grant a mistrial will be reversed only for an abuse of discretion, using "manifest necessity" as the benchmark. *Ried v. State*, 610 N.E.2d 275, 279 (Ind.Ct.App.1993), *summ. aff'd.* 615 N.E.2d 893 (Ind.1993).

 One important factor in determining whether manifest necessity exists is whether the reason for granting mistrial can be laid at the feet of the State. If the error in the proceedings is the fault of the prosecution, then the burden on the State to show

---

**3.** Neither the record nor either party gives any indication that an alternate juror was available.

**4.** Brown does not provide any authority or independent analysis supporting a separate standard under the Indiana Constitution. Accordingly,

the state constitutional claim is waived. *Games v. State*, 684 N.E.2d 466, 473 n. 7 (Ind.1997), *modified on reh'g*, 690 N.E.2d 211 (Ind.1997), *cert. denied*, —— U.S. ——, 119 S.Ct. 98, 142 L.Ed.2d 78, 67 U.S.L.W. 3231 (1998).

manifest necessity is much higher. This doctrine is fleshed out in both decisional and statutory law of this State. In *Tyson v. State*, 543 N.E.2d 415 (Ind.Ct.App.1989) in the midst of trial, the State was unable to locate one of its witnesses. The trial court granted a mistrial and ordered a new trial at the State's request and over the defendant's objection. The Court of Appeals reversed, holding that the absence of the State's witness did not create a manifest necessity. Rather, the mistrial merely afforded the State with a second, more favorable opportunity to convict the defendant. *Id.* at 419. *See also Corley v. State*, 455 N.E.2d 945 (Ind.1983) (no manifest necessity where jury was discharged to allow the State to depose a witness, particularly where the State had already extensively questioned the witness in private); *Burton v. State*, 510 N.E.2d 228 (Ind.Ct.App.1987) (no manifest necessity where new trial was granted to permit the State to introduce evidence that had been excluded from the first trial); IND.CODE § 35–41–4–3(b) (1998) (if prosecution brings about any of statutorily listed circumstances, e.g., false statements of a juror on voir dire which prevented fair trial, with intent to cause termination of the trial, reprosecution is barred). On the other hand, in *Mooberry v. State*, 157 Ind.App. 354, 300 N.E.2d 125 (1973), a somewhat analogous situation to the case at bar, retrial was permitted when the trial court learned that two jurors in a rape trial knew the prosecuting witness. *See also Patterson v. State*, 495 N.E.2d 714 (Ind.1986) (manifest necessity existed where witness mistakenly referred to lie detector results ruled inadmissible by the trial court); *White v. State*, 460 N.E.2d 132 (Ind.1984) (manifest necessity existed where coroner's refusal to give opinion made fair trial impossible for both sides); IND.CODE § 35–37–2–3(b) (1998) (where court finds that juror has knowledge of a material fact, juror is excused and alternate appointed; if no alternate, then court may discharge the jury without prejudice unless parties agree to submit the cause to the remaining jurors).[5]

■ Here we are faced with a juror who expresses concern that the verdict might affect his personal interests—both his ability to function as a minister and also his safety. This presents a structural impediment to a fair trial. The only remaining question is whether the State was responsible for the situation. If so, as in *Tyson*, 543 N.E.2d at 415, the State had its opportunity to convict Brown the first time and he should not have been retried. If not, as in *Mooberry*, then the "ends of public justice" warranted the second trial. *Perez*, 22 U.S. (9 Wheat.) at 580, 6 L.Ed. 165.[6]

**5.** Some of the values underlying the protection against double jeopardy were stated by the Court in *Arizona v. Washington*. A second trial "increases the financial and emotional burden on the accused, prolongs the period in which he is stigmatized by an unresolved accusation of wrongdoing, and may even enhance the risk that an innocent defendant may be convicted"—for example by changes in witness testimony from one trial to the next. *Arizona v. Washington*, 434 U.S. at 503–04, 98 S.Ct. 824, 54 L.Ed.2d 717. The strength of these values, though always to be considered, are not as great when the trial is terminated shortly after jeopardy has attached as opposed to at a later stage in the trial. Here, Edwards came forward after Brown made his opening statement, shortly after the jury had been sworn in. Accordingly, the danger of unfairness posed by a new trial was not great. However, this is not to understate the importance of the general rule that the prosecution "is entitled to one, and only one, opportunity to require an accused to stand trial." *Id.* at 505, 98 S.Ct. 824, 54 L.Ed.2d 717. The classic situation justifying a new trial is in the case of a hung jury. *Downum v. United States*, 372 U.S. 734, 736, 83

S.Ct. 1033, 10 L.Ed.2d 100 (1963). This is warranted, despite the late stage at which it occurs, because of society's interest in giving the prosecution one complete opportunity for a conviction. *Arizona v. Washington*, 434 U.S. at 509, 98 S.Ct. 824, 54 L.Ed.2d 717.

**6.** Justice Sullivan's dissent distinguishes *Mooberry* and *Patterson* from the case at bar because in those cases the court granted a new trial sua sponte. We do not agree that manifest necessity turns on this distinction. *See Illinois v. Somerville*, 410 U.S. 458, 460, 93 S.Ct. 1066, 35 L.Ed.2d 425 (1973) (State's motion for mistrial because of manifest necessity granted by trial court and upheld on appeal); *accord Wright v. State*, 593 N.E.2d 1192, 1196 (Ind.1992). More crucial factors are what happened to render the proceedings potentially unfair, whether what happened was the State's fault, and the ends of public justice. Here, immediately after Edwards returned to the jury room the court said "We've got a problem." Counsel agreed. We cannot know whether, if the State had not moved for a new trial, the court would have acted sua sponte. Similarly, there is no reason to believe that the

At voir dire, the following colloquies took place between the State and Edwards:

State: Have you or anyone you know ever had a negative experience with law enforcement or police or prosecutors or anything like that?

Edwards: Yeah. I hear it everyday of every week.

State: Is there anything about that that you feel makes you feel one way or another about this particular case?

Edwards: This case, no.

State: Do you think you could be fair and impartial?

Edwards: Yeah.

State: Have you ever had anyone that you knew or were close to who had like a brush with a criminal justice system?

Edwards: Yes. There are those that I get to know.

State: Is there anything about that that makes you feel one way or another about sitting in this case?

Edwards: No.

State: Do you feel you could be fair and impartial even in those circumstances?

Edwards: Yes.

The State twice asked Edwards if "negative experiences" or "brushes" with criminal justice, whatever they were, would affect his ability to remain an impartial juror. Edwards twice assured the State, without volunteering any specifics, that he could be fair and impartial.[7] Faced with Edwards' unequivocal assurances, the State cannot be held accountable for failing to divine that he was in fact an unsuitable juror. This is akin to the situation where a juror makes false statements on voir dire that prevent a fair trial. In such a case, reprosecution is not barred unless the State brought about the false statements with intent to terminate the trial. IND.CODE § 35-41-4-3 (1998). Here, Edwards declared his intent to be impartial in good faith but later, after further reflec-

tion, had a change of heart. Although no one suggests his statements were intentionally misleading, they had the same potential effect on the fairness of the trial as would deliberate misstatements of fact. Just as the statute provides that intentional misstatements by a juror are a basis for retrial unless the State can be said to be responsible for the tainted proceedings, reprosecution is not necessarily barred by unintentional misstatements or understandable omissions. A juror who recognizes that his decision in the case may affect his ministry or even his safety presents a situation where an event outside the State's or the court's control seriously threatened the fairness of the proceedings. The trial court is in the best position to evaluate the gravity of this impediment, and the decision of the trial court here is well supported by the record. *See also Arizona v. Washington,* 434 U.S. at 511, 98 S.Ct. 824, 54 L.Ed.2d 717 (according the "highest degree of respect" to the trial court's evaluation of possible juror impartiality). Under these circumstances, the court was within its discretion in concluding that there was a manifest necessity to order a new trial. The federal Double Jeopardy Clause did not bar Brown's reprosecution.

## II. Impeachment Testimony by Conviction in Another Jurisdiction

Brown took the stand at trial in his own defense. During cross-examination, in an effort to impeach Brown under Indiana Evidence Rule 609(a), the State asked Brown if he was convicted of burglary in the State of Illinois in June 1991. Brown objected and the court overruled the objection. Brown contends, as he did at trial, that evidence of the prior conviction was not admissible under Rule 609(a). That rule provides:

For the purpose of attacking the credibility of a witness, evidence that the witness has been convicted of a crime ... shall be admitted but only if the crime committed

results in *Mooberry* or *Patterson* would have been different had the State moved for a mistrial before the court acted.

**7.** As Edwards later explained, he was eager to serve on a jury to see the other side of the justice process and to stress to other jurors the importance of the reasonable doubt standard. He stated that he did not consider the impact it might have on his role as a minister until voir dire was completed.

... is (1) murder, treason, rape, robbery, kidnapping, burglary, arson, criminal confinement or perjury; or (2) a crime involving dishonesty or false statement.

Brown notes that in Indiana "burglary" requires the breaking and entering of a "building or structure" of another person. IND. CODE § 35–43–2–1 (1998). The burglary for which Brown was convicted in Illinois, however, involved entering an automobile with intent to commit theft. Brown contends that the "burglary" in Illinois would not have been "burglary" in Indiana and therefore evidence of the prior conviction was not admissible under Rule 609(a).

■■■■ We agree that for purposes of Rule 609(a) evidence of a prior conviction in another jurisdiction is not automatically admissible to impeach simply because the other jurisdiction uses a label for the crime that is found in the Rule 609(a)(1) list.[8] If the crime is not substantially equivalent to the Indiana crime listed, it does not qualify under Rule 609(a)(1). However, it was not error to admit the evidence in this case. As a general rule, pursuant to law developed before the codification of Rule 609(a)(2), evidence of prior theft convictions is admissible for impeachment purposes as proof of a crime involving dishonesty or false statement. *Fletcher v. State*, 264 Ind. 132, 137, 340 N.E.2d 771, 774 (1976); *accord Geisleman v. State*, 274 Ind. 241, 245, 410 N.E.2d 1293, 1296 (1980); *Smith v. State*, 403 N.E.2d 869, 877 (Ind.Ct.App.1980). Brown's Illinois conviction for entering an automobile with intent to commit theft puts him squarely in the theft box in terms of culpability. However, theft encompasses a wide variety of factual situations, some of which have been held not to indicate a witness's lack of truthfulness or veracity. *Sweet v. State*, 498 N.E.2d 924, 927

(Ind.1986) (State showed by affidavit in support of its Motion in Limine that the theft in question was not the type of theft which bespeaks a lack of veracity). In order to avoid the presumption that theft is a Rule 609(a)(2) crime, the defendant must make the ameliorating facts "known to the court through a pre-trial motion in limine, supported by appropriate affidavits, thereby allowing the court the opportunity to exclude, in its discretion, any reference to such prior conviction." *Fletcher*, 264 Ind. at 137, 340 N.E.2d at 775. Brown made no motion in limine or other offer with respect to the Illinois conviction. Accordingly, Brown failed to rebut the presumption and the conviction was admissible for impeachment purposes.

### III. Jury Instructions

Brown contends that the trial court erred in refusing his requested jury instructions on the lesser included offenses of voluntary manslaughter and reckless homicide, and on the defense of voluntary intoxication.

■■■ At trial, Brown made a conclusory objection "to the Court's refusal to give defendant's tendered instructions." He did not elaborate or explain the basis for the tendered instructions either before the court refused them or in his objection to that refusal. An objection to a rejection of a properly tendered instruction is not required and if made need not be detailed or distinct to preserve the error for appeal. *Carroll v. Statesman Ins. Co.*, 509 N.E.2d 825, 827 (Ind.1987) (expressly adopting and incorporating the Court of Appeals' decision, 493 N.E.2d 1289, 1294, that "a party need not specifically object to the refusal of a tendered instruction"); *Whitehair v. State*, 654 N.E.2d 296, 307–08 (Ind.Ct.App.1995); *State Farm*

---

**8.** This is particularly true given the genesis of Rule 609(a)—which is significantly different from its federal equivalent. The parameters of the Rule were established in *Ashton v. Anderson,* 258 Ind. 51, 279 N.E.2d 210 (1972). Before *Ashton,* evidence of any prior criminal conviction was admissible to impeach the credibility of a witness. However, *Ashton* held that only two classes of conviction could be used for impeachment purposes: (1) those involving dishonesty or false statement; and, pursuant to statute, (2) those for "infamous crimes" which would have

rendered the witness incompetent to testify under prior Indiana law. IND CODE § 34–1–14–14 (1993) (recodified at *Id.* § 34–45–2–13 (1998)). The crimes listed in Rule 609(a)(1) are "infamous crimes." Accordingly, a conviction for burglary in another state, which would not be burglary in Indiana, would be admissible under Rule 609(a) if the offense would have rendered the witness incompetent under prior Indiana law. Because the burglary conviction in this case was admissible on other grounds, we do not address this issue.

*Mut. Auto. Ins. Co. v. Shuman*, 175 Ind.App. 186, 201, 370 N.E.2d 941, 953 (1977); *cf.* Indiana Criminal Rule 8(H) & Indiana Trial Rule 51(C) (to preserve claim of error in the giving of an instruction party must "state distinctly the matter to which he objects and the grounds of his objection"). As explained below, however, the standard of review of the failure to give a requested lesser included offense instruction is affected by the specificity with which a defendant presents the case for the instruction to the trial court.

### A. *Standard of review*

 When asked to instruct the jury on a lesser included offense, trial courts are to apply the three part test set out in *Wright v. State*, 658 N.E.2d 563, 566–67 (Ind.1995). Parts one and two require the trial court to determine whether the lesser included offense is either factually or inherently part of the greater offense. If so, *Wright* requires the trial court to determine if there is a "serious evidentiary dispute" as to any element that distinguishes the greater offense from the lesser. This is shorthand for *Wright*'s full holding that "if, in view of this dispute, a jury could conclude that the lesser offense was committed but not the greater, then it is reversible error for a trial court not to give an instruction, when requested, on the inherently or factually included lesser offense." *Id.* at 567. For convenience we will term a finding as to the existence or absence of a substantial evidentiary dispute, a *Wright* finding. Where such a finding is made we review the trial court's rejection of a tendered instruction for an abuse of discretion. *Champlain v. State*, 681 N.E.2d 696, 700 (Ind.1997). This finding need be no more than a statement on the record that reflects that the trial court has considered the evidence and determined that no serious evidentiary dispute exists. *See McEwen v. State*, 695 N.E.2d 79 (Ind.1998). Its purpose is to establish that the lack of a serious evidentiary dispute and not some other reason is the basis of the trial court's rejection of the tendered instruction. However, if the trial court rejects the tendered instruction on the basis of its view of the law, as opposed to its finding that there is no serious evidentiary dispute, appellate review of the ruling is

de novo. *Champlain*, 681 N.E.2d at 700. Here, the trial court made no finding as to whether a serious evidentiary dispute existed or not. In the absence of such a finding, we will presume that the trial court followed controlling precedent and applied *Wright*. *See Bishop v. Sanders*, 624 N.E.2d 64, 66 (Ind.Ct.App.1993) ("Where the trial court did not explicitly find facts necessary to support its judgment, we assume the trial court so found."). However, without a *Wright* finding, the standard of review of an unexplained ruling will turn on whether the defendant made clear what constituted the claimed serious evidentiary dispute. If the parties present the claimed basis for the instructions to the trial court, it will promote a finding on the issue by the trial court and hopefully assist the trial court in reaching the correct ruling and thereby reduce the need for appeals. Moreover, if a defendant points out on the record the nature of the serious evidentiary dispute and the evidence supporting it a reviewing court will be better equipped to evaluate the trial court's ruling.

 In order to encourage the defendant to educate the trial court, we will undertake a de novo review of the record if the trial court fails to make a finding as to the existence vel non of the serious evidentiary dispute and the basis in the evidence for a claimed dispute is made clear. This must be done at least in the form of an objection at the time the trial court rules on the tendered instruction. A statement as simple as, e.g., "I believe there is a serious evidentiary dispute regarding my client's intent to commit murder" will suffice. Preferably the tendered instruction will be accompanied by a further explanation as to the claimed dispute, but this is not necessary to trigger de novo review in the event the trial court fails to make a *Wright* finding. In order to encourage trial courts to make such a finding, if one is made the standard of review will be the customary abuse of discretion. *See generally Fields v. State*, 679 N.E.2d 1315, 1322 (Ind. 1997); *accord Reaves v. State*, 586 N.E.2d 847, 855 (Ind.1992); *Castro v. State*, 580 N.E.2d 232, 235 (Ind.1991). As the concurrence correctly points out, the trial court merely needs to make a simple statement

such as that it has "determined that no serious evidentiary dispute exists." *See* 703 N.E.2d 1022. *Wright* requires a trial court to exercise discretion in determining whether a serious evidentiary dispute exists. If that is done, requiring the trial court to say so is a minimal burden. But, in the absence of any indication that the trial court has considered the issue and exercised this discretion, de novo review is the appropriate standard. Without this requirement, the concurrence's "plain old 'abuse of discretion,'" *id.*, standard leaves the appellate court in the precarious position of evaluating the abuse of discretion when discretion was perhaps never exercised.

■ In sum, when the court rejects tendered instructions on lesser included offenses on their merits, but the record provides neither a finding that there is no serious evidentiary dispute nor a specific claim from the defendant as to the nature of that dispute, the standard of review is an abuse of discretion. The same is true if the trial court does make a finding that there is no serious evidentiary dispute. However, where the defendant points to a specific evidentiary dispute but the trial court does not make a *Wright* finding, de novo review is the appropriate standard. In this case, because there was no explanation of Brown's contention in the trial court, i.e., no explanation by Brown why the instruction should have been given, we review for abuse of discretion.

### B. *Voluntary manslaughter instruction*

■ Voluntary manslaughter is an inherently lesser included offense of murder. It is a knowing or intentional killing committed while acting under sudden heat. IND. CODE § 35–42–1–3 (1993). "Sudden heat" is not an element of voluntary manslaughter. Rather it is a mitigating factor distinguishing voluntary manslaughter from murder. It has been defined as "sufficient provocation to excite in the mind of the defendant such emotions as anger, rage, sudden resentment, or terror, and that such excited emotions may be sufficient to obscure the reason of an ordinary man." *Fox v. State*, 506 N.E.2d 1090, 1093 (Ind.1987). "Any appreciable evidence of sudden heat justifies an instruction on voluntary manslaughter." *Roark v. State*,

573 N.E.2d 881, 882 (Ind.1991). Here the trial court concluded without making a *Wright* finding that the instruction was not warranted. In the absence of a specific objection by the defendant, we review that conclusion for an abuse of discretion.

■ Brown's contention at trial was that he killed Hall in self defense. He did not contend that he became enraged by Hall's charging at him with a knife and killed Hall in a moment of induced irrationality. However, there was arguably some "appreciable evidence" to that effect. Brown was the only source of information about the nature of the dispute between himself and Hall. Brown contended that he entered Hall's apartment and asked for the money owed him. Hall, he said, responded by becoming hysterical and attacking him with a knife. Brown said he upended Hall and tried to leave the apartment, but Hall again lunged after him. Brown testified that he was "angry" because Hall persisted in trying to harm him, even after Brown attempted to leave Hall's home. In an effort to defend himself, Brown stabbed and killed Hall.

The trial court instructed the jury on self defense but refused to instruct on voluntary manslaughter. The trial court is in the best position to evaluate the substantiality of the evidence and decide whether Brown's testimony, in the light of the other evidence, presented a serious evidentiary dispute with respect to sudden heat. We presume the court decided it did not. Neither at trial, nor on appeal to this Court, did Brown make any specific contention as to precisely what evidence he contended created a serious evidentiary dispute. If there is "appreciable evidence" of sudden heat in the record, Brown did not provide any indication of what this evidence might be. *See Fields*, 679 N.E.2d at 1322 (no error in refusing reckless homicide instruction where defendant failed to specify any evidence in the record to support the giving of the instruction). A specific objection would not only accord him de novo review in the absence of a *Wright* finding, but also would have given the trial court notice of the nature of his objection and more of an opportunity to correct any contended error. On this record, even if we might

reach a different conclusion de novo, we cannot conclude that the trial court abused its discretion in refusing to give a voluntary manslaughter instruction.

### C. *Reckless homicide instruction*

 Reckless homicide is an inherently included lesser offense of murder. The element distinguishing it from murder is a "reckless" state of mind as compared to a "knowing or intentional" state of mind. *Compare* IND.CODE § 35–42–1–1 (1998) *with* IND.CODE § 35–42–1–5 (1998). "Reckless" conduct occurs when a person "engages in the conduct in plain, conscious, and unjustifiable disregard of harm that might result and the disregard involves a substantial deviation from acceptable standards of conduct." IND. CODE § 35–41–2–2(c) (1998). Neither Brown's theory of self defense nor the evidence show that Brown acted recklessly when he took Hall's life. The trial court could reasonably determine that by inflicting over twenty wounds Brown acted "knowing" that his actions could produce death. The trial court did not err in refusing the reckless homicide instruction.

### D. *Voluntary intoxication instruction*

 As to the refused instruction on voluntary intoxication, an intoxication instruction should be given only where the evidence relevant to the defense, if believed, was such that it could have created a reasonable doubt in the jury's mind that the accused had acted with the requisite mental state or specific intent. *State v. Van Cleave*, 674 N.E.2d 1293, 1303 (Ind.1996). Brown's own account reveals a series of transactions and interactions with others that are inconsistent with inability to know what he was doing or form the requisite intent. There is evidence that Brown smoked cocaine at least half an hour before the killing. But Brown's theory of self defense does not invoke his cocaine use as a factor in the killing. Instead, Brown asserts that he entered Hall's apartment in search of money, sat at the kitchen table, and spoke with Hall for a couple of minutes until Hall's manner changed and he asked Brown to leave. Brown said he attempted to leave but Hall prevented him. This scenario does not create a reasonable doubt that Brown was capable of knowing what he was doing and forming an intent to kill. Accordingly, it was not error to refuse the voluntary intoxication instruction.

### Conclusion

We affirm the trial court.

DICKSON and SELBY, JJ., concur.

SHEPARD, C.J., concurs in result with separate opinion.

SULLIVAN, J., dissents with separate opinion.

SHEPARD, Chief Justice, concurring in result.

I join the majority in affirming the judgment and I agree with all of Justice Boehm's opinion save his outline of shifting standards of appellate review for trial court decisions about whether to instruct on lesser included offenses.

To put it simply, I think the majority has "over-lawyered" the matter.

The call a trial judge makes under *Wright v. State* when deciding whether a "serious evidentiary dispute" exists largely involves an assessment of the evidence on that element of the greater offense which differentiates it from the lesser offense. Is there conflicting evidence or has the defendant merely stood on his presumption of innocence? Is the differentiating element a matter earnestly joined at trial or does the defense really seem to be some unrelated claim, like identity or self-defense?

To be sure, an appellate court is always better off if trial counsel and the trial judge have spelled out in detail the nature of the claim and the reasons for the ruling. Still, these "serious evidentiary dispute" calls rest on the state of the evidence, something readily available to us on appeal.

I see today's system of shifting standards as unlikely to be very effective in accomplishing the announced objectives—"to encourage the defendant to educate the trial court" and "to encourage the trial court to make [*Wright*

findings]." Op. at 1019–20. The pressures that participants in a criminal trial experience as the matter accelerates towards a conclusion are such that we are unlikely to get much more than we already receive. Moreover, the likelihood that today's rules will "reduce the need for appeals", Op. at 1019, is very low.

At the end of the day, this new regime requires lawyers to declare, "I believe there is a serious evidentiary dispute" and identify its nature in the hope of gaining de novo review on appeal. Op. at 1019. On the other hand, a defendant's chance for de novo review can be blocked by a judge's mere reply that "the court has determined that no serious evidentiary dispute exists." Slip. op. at 1019. This seems to me like a good deal of running in place, and it is difficult to see that there will be much reward for the effort.

I regard plain old "abuse of discretion" as adequate to this modest challenge and I would stick by it.

SULLIVAN, Justice, dissenting.

I respectfully dissent. I see no manifest necessity for a mistrial here. A juror, having twice professed his ability to serve and serve impartially, changed his mind after the trial began (and jeopardy had attached). The State, armed with new information that the juror was a jail chaplain and likely to be favorably disposed to the defendant, moved for a mistrial. This is unlike the *Mooberry* and *Patterson* cases cited by Justice Boehm where the trial court declared the mistrial *sua sponte*, rather than on the motion of the State.[1] *See Mooberry v. State,* 157 Ind.App. 354, 357, 300 N.E.2d 125, 127 (1973); *Patterson v. State,* 495 N.E.2d 714, 719 (Ind.1986).

The fact that the State made the motion for mistrial here is very telling. This strikes me as a classic case of a mistrial affording the State with a second, more favorable opportunity to convict the defendant.

---

1. As to the *White* case cited by Justice Boehm, it is not clear whether the State moved for a mistrial. While there is reference in Justice Pivarnik's opinion to "a motion for mistrial," *White,* 460 N.E.2d at 135, it appears to be a reference to an earlier writ proceeding in the same case. The opinion on the writ request also does not make clear whether the State moved for a mistrial or whether the trial court granted it *sua sponte. See State ex rel. White v. Marion Superior Court,* 271 Ind. 174, 391 N.E.2d 596 (1979).