**Cheryl Jean DIXON, Appellant–Defendant,**

v.

**STATE of Indiana, Appellee–Plaintiff.**

**No. 65A05–0109–CR–412.**

Court of Appeals of Indiana.

Oct. 28, 2002.

Glenn A. Grampp, Evansville, IN, for Appellant.

Steve Carter, Attorney General of Indiana, Grant H. Carlton, Deputy Attorney General, Indianapolis, IN, for Appellee.

## OPINION

DARDEN, J.

### STATEMENT OF THE CASE

Cheryl Jean Dixon appeals her convictions, after a jury trial, of voluntary manslaughter as a class A felony and of involuntary manslaughter as a class C felony.

We affirm the conviction of voluntary manslaughter but remand to vacate the conviction for involuntary manslaughter.

### ISSUES

1. Whether Dixon's convictions must be reversed because the State failed to disprove her claim of self-defense.

2. Whether one or both of her convictions should be reversed because the guilty verdicts are inconsistent.

3. Whether the two convictions violate the Double Jeopardy clause of Indiana's constitution.

### FACTS

On February 1, 2000, Dixon arrived home from work about 6:00 p.m. Her husband Dan, who had not worked for the previous six months, was at home. Dixon proceeded to make a series of telephone calls over the next two hours, and her husband began to yell at her about being on the telephone. Dan and Dixon argued, and then Dixon went in the bathroom. Dan came into the bathroom and "smacked" her, causing her to fall to the floor. (Ex. 2). Dan and Dixon continued to argue, and she told him to go downstairs and go to bed.[1] Dan told Dixon, "You're not big enough to make me," to which she responded, "Yes, I am." *Id.* Dan said, "You forget the size I am," at which point Dixon went to the bedroom and retrieved a .380 caliber semi-automatic handgun from the drawer of her nightstand. *Id.* On her way out of the bedroom, she pulled back "the top part of" the gun and heard something fall out on the floor. *Id.* She called to Dan to "go downstairs and leave [her] alone." *Id.* Dixon then went down the hallway past the bathroom to the entry to the kitchen.[2] She found Dan sitting in a chair on the far side of the room. When Dan saw the gun, he laughed and said, "You're too chicken," "mocking [her], like you're not going to do it." *Id.* Dixon said, "I'll show you" and "raised the gun up" with both hands. *Id.* The gun fired. Dan was fatally wounded and died on the kitchen floor.

It was about 8:00 p.m. when Dixon called 911 and told the dispatcher, "I shot my husband." *Id.* Dixon was transported to the Posey County Jail and interviewed by Indiana State Police Detective Alan Sherritz. After being advised of her *Miranda* rights, and signing a waiver thereof, Dixon answered various questions in a videotaped statement commencing at about 11:15 p.m. The previous paragraph portrays her version of the evening as given in her statement.

The State charged Dixon with voluntary manslaughter, a class A felony, for having knowingly killed Dixon, by means of a deadly weapon, while acting under a sud-

---

1. In the Dixon home, the kitchen, living room, bathroom and marital bedroom were on the ground floor, and a lower level contained a family room area and a spare bedroom that Dan sometimes used.

2. The stairs to the basement descended from the kitchen.

den heat.[3] The State also charged Dixon with involuntary manslaughter, a class C felony, for killing Dan while committing or attempting to commit the class D felony of pointing a firearm.

At trial, the State played Dixon's videotaped statement. Detective Sherritz and the initial deputy sheriff to respond to the Dixon home testified that they had seen no marks or bruising on Dixon that night. The crime scene technician identified the .380 caliber handgun containing three unfired cartridges, a live cartridge found on the floor of the bedroom, and the fired cartridge casing recovered from the scene. According to the firearms expert witness, the handgun had a six-cartridge capacity. The firearms expert also testified that during repeated testing of the handgun, it never discharged accidentally; it would not fire "unless the trigger was pulled to the rear;" and 9½ to 10 pounds of pressure were needed to pull the trigger. (Tr. 69).

Dixon took the stand and testified that Dan had physically abused her "quite a few times." (Tr. 104). She described how Dan had once pushed her down the stairs and had knocked her out on several occasions. On that night, Dixon testified, after being struck by Dan in the bathroom, she went to the kitchen, and Dan shoved her against the refrigerator. Dixon testified that his eyes looked "wild," and she was "scared of him," "terrified." (Tr. 122). Dixon testified that she left the kitchen and went to the bedroom and got the gun. When she returned to the kitchen with it, Dixon testified, Dan was sitting at the table. "[W]hen he saw the gun," she testified, he "was laughing, he was just like, 'What are you going to do?'" and then

moved "like he was going to get up." (Tr. 128). She raised the gun "to show him" and "then there was an explosion." (Tr. 148, 129). She testified that when she raised the gun, she just intended "to scare him." (Tr. 129).

The jury convicted Dixon of both voluntary manslaughter and involuntary manslaughter. According to the CCS, the trial court entered judgment of conviction on both charges. It sentenced her to 22 years for the voluntary manslaughter offense and 4 years for the involuntary manslaughter offense, to be served concurrently.

## DECISION

### 1. Self–Defense

Dixon first contends "that the State failed to rebut or disprove her asserted defense of self-defense." Dixon's Br. at 5. As she correctly notes, under Indiana law a defendant who raises the claim of self-defense

> is required to show three facts: 1) [she] was in a place where he had a right to be; 2) [she] acted without fault; and 3) [she] had a reasonable fear of death or great bodily harm.

*Wallace v. State*, 725 N.E.2d 837, 840 (Ind. 2000). According to Dixon, she established each of these facts. We disagree.

On review of a claim that the State failed to negate a claim of self-defense, the issue "is typically whether the State presented sufficient evidence to support a finding that at least one of the elements of the defendant's self-defense claim was negated." *Id.* We consider a challenge to the sufficiency of evidence to

---

3. Sudden heat requires sufficient provocation to engender passion, and sudden provocation is demonstrated by anger, rage, sudden resentment, or terror that is sufficient to obscure the reason of an ordinary person, prevent deliberation and premeditation, and render the defendant incapable of cool reflection. *Griffin v. State*, 644 N.E.2d 561, 562 (Ind.1994) (citations omitted).

rebut a claim of self-defense by the same standard of review as for any sufficiency of the evidence claim. *Id.* We neither reweigh the evidence nor judge the credibility of witnesses, and if there is sufficient evidence of probative value to support the conclusion of the trier of fact, then the verdict will stand. *Id.*

In her taped statement given on the night of the shooting, Dixon never asserted that her actions were motivated by her fear for her safety. In the statement, she did not say that she thought Dan was going to launch an attack at her from his seated position in the chair; nor did she express having felt that she was in immediate danger. Furthermore, at trial, after testifying that she had been terrified that night by Dan, she nevertheless testified that her intent when she raised the gun was "to scare him" (Tr. 129)—not to protect herself from a perceived imminent danger.[4] This evidence is sufficient to support the jury's conclusion that Dixon had not established the fact that when she raised the gun, she "had a reasonable fear of death or great bodily harm." *Wallace,* 725 N.E.2d at 840. Because "at least one of the elements of the defendant's self-defense claim was negated," *id.,* the convictions are sustained. Dixon's argument about her self-defense evidence simply invites us to reweigh the evidence in her favor, which we cannot do. *See id.*

### 2. *Verdicts*

█ Dixon next claims that the jury's verdicts were "inconsistent, mutually exclusive and irreconcilable," requiring that her convictions be reversed. Dixon's Br. at 9. She cites *Owsley v. State,* 769 N.E.2d

181 (Ind.Ct.App.2002), in support of her position.

In *Owsley,* we held that the defendant's conviction for conspiracy to commit dealing in cocaine was "irreconcilable and impermissibly inconsistent with his acquittals for possession of cocaine and dealing in cocaine arising out of the same alleged criminal transaction." *Id.* at 182.[5] We reviewed the history of the law concerning "alleged inconsistencies in criminal verdicts." *Id.* In *Dunn v. U.S.,* 284 U.S. 390, 52 S.Ct. 189, 76 L.Ed. 356 (1932), the defendant was charged with maintaining a common nuisance by keeping liquor for sale at a specified place, unlawful possession of the liquor, and the unlawful sale of the liquor. Based upon the same evidence "for all the counts," the defendant was convicted on the first count but acquitted on the second and third counts. 284 U.S. at 392, 52 S.Ct. 189. The U.S. Supreme Court affirmed, with Justice Holmes opining that although the verdicts "may have been the result of compromise, or of a mistake on the part of the jury, ... verdicts cannot be upset by speculation or inquiry into such matters." *Id.* at 394, 52 S.Ct. 189. In *Marsh v. State,* 271 Ind. 454, 393 N.E.2d 757 (1979), our supreme court found no fatal inconsistency where the defendant was found guilty of voluntary manslaughter but found not guilty of assault and battery with intent to kill. The court stated that "perfectly logical verdicts should not be demanded," and that only "extremely contradictory and irreconcilable verdicts warrant corrective action." *Id.* at 761.

These cases involve what we referred to as "opposing verdicts on different counts":

---

**4.** Also, under either version of events, the time during which Dixon went to the bedroom, got to the gun, and then walked down the hallway to the kitchen gave her time to reflect before acting. *See Griffin,* 644 N.E.2d at 562.

**5.** We remanded for retrial on the conspiracy charge.

"an acquittal on one count" along with "a conviction on a similar or related count." *Owsley,* 769 N.E.2d at 184. Because there are no such "opposing verdicts" here, Dixon's argument is unavailing.

### 3. *Double Jeopardy*

■ Even if a party does not raise the issue of double jeopardy on appeal, a reviewing court may *sua sponte* address the issue. *Leitch v. State,* 736 N.E.2d 1284, 1288 (Ind.Ct.App.2000) (citing *Logan v. State,* 729 N.E.2d 125, 136 (Ind.2000)), *trans. denied.* Article I, Section 14 of the Indiana Constitution provides, "No person shall be put in jeopardy twice for the same offense." Indiana's "Double Jeopardy clause 'is violated if there is a reasonable possibility that the evidentiary facts used by the fact-finder to establish the essential elements of one offense may also have been used to establish the essential elements of a second challenged offense.'" *Guyton v. State,* 771 N.E.2d 1141, 1142 (Ind.2002) (quoting *Richardson v. State,* 717 N.E.2d 32, 53 (Ind.1999)).

Dixon was charged with voluntary manslaughter. The elements of voluntary manslaughter that the State was required to prove beyond a reasonable doubt "are that [the] defendant knowingly or intentionally killed another human being." *Rowan v. State,* 431 N.E.2d 805, 812 (Ind. 1982).[6] We have held that the use of a deadly weapon in a manner likely to cause death or serious bodily injury may establish that the defendant "acted with an awareness of a high probability of killing someone, *i.e.* knowingly." *Booker v. State,* 741 N.E.2d 748, 756 (Ind.Ct.App.2000). In both her statement and her trial testimony, Dixon admitted that she killed Dan when she raised the handgun toward him.

In both versions, she did so after telling him she would "show him." This evidence would support the jury's conclusion that Dixon pointed the gun at Dan while knowing of the high probability of his resulting death or serious injury.

As to the charge of involuntary manslaughter, the State was required to prove beyond a reasonable doubt that Dixon killed Dan while committing or attempting to commit the felony of pointing a loaded firearm at another person, an act that inherently poses a risk of serious bodily injury. *See* IND. CODE §§ 35–42–1–4(1), 35–47–4–3(b). Dixon's admission that she raised the handgun toward Dan supported the jury's conclusion that the State had proved beyond a reasonable doubt that Dixon committed this offense.

■ The State observes that it "may have established the elements of both crimes from the same facts." State's Br. at 7. We think that this is the case, and that there is indeed "a reasonable possibility that the evidentiary facts used by" the jury to establish that Dixon committed the offense of voluntary manslaughter "may also have been used to establish the essential elements" of the offense of involuntary manslaughter. *Guyton,* 771 N.E.2d at 1142. Because both convictions "cannot stand, we vacate the conviction with the less severe penal consequences." *Richardson,* 717 N.E.2d at 55. Therefore, Dixon's involuntary manslaughter conviction is ordered vacated.

We affirm in part and reverse and remand in part.

BROOK, C.J., and KIRSCH, J., concur.

---

**6.** "Sudden heat" is "not an element of voluntary manslaughter" but rather "a mitigating factor distinguishing voluntary manslaughter from murder." *Brown v. State,* 703 N.E.2d 1010, 1020 (Ind.1998), *see also* IND. CODE § 35–42–1–3(b).