**Phillip STROUD, Appellant–Defendant,**

v.

**STATE of Indiana, Appellee–Plaintiff.**

No. 71A03–0206–CR–215.

Court of Appeals of Indiana.

April 30, 2003.

---

Andre B. Gammage, Berger James & Gammage, South Bend, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Michael Gene Worden, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

FRIEDLANDER, Judge.

Phillip Stroud appeals his conviction of Dealing in Cocaine,[1] a class B felony. Stroud present three issues for review, only two which need to be addressed on appeal. We restate those issues as:

1. Did the trial court commit reversible error in denying Stroud's motion for mistrial?

2. Was the evidence sufficient to support the conviction?

We reverse.

The facts favorable to the conviction are that at all times relevant to this appeal, Officer Kenneth Cornelis of the St. Joseph County Police Department was working on the Metro Special Operations Section (MSOS). While Officer Cornelis was working undercover with that unit, he met Stroud. When they first met, Stroud was introduced by the nickname "Poochie." *Transcript* at 290. MSOS supervisors subsequently provided Officer Cornelis with a photograph that he recognized as the man he knew as Poochie. Stroud was the man depicted in the photograph. On September 1, 1998, Officer Cornelis planned and participated in a controlled drug purchase. He was fitted with a concealed microphone and transmitter, which enabled surveillance officers to monitor his safety and record his conversation with the seller.

Officer Cornelis went to a pay phone and dialed a beeper number that Stroud had given him. He left a message informing Stroud of the amount of crack cocaine that he wished to purchase and giving Stroud the number of a pay phone where Stroud was to call him. A short time later, the pay phone rang and Cornelis answered. He recognized the voice of the caller as Stroud's. Officer Cornelis asked Stroud if he "could come through and buy a hundred dollars worth." *Transcript* at 293. Stroud asked how long he was going to be, and Officer Cornelis responded that it would be about twenty minutes. That telephone conversation was recorded and admitted into evidence.

Officer Cornelis went to Huron Street and parked his car. A short time later, Stroud drove up and pulled directly in front of Officer Cornelis's vehicle. Stroud exited his vehicle and got into the front passenger seat of Officer Cornelis's vehicle. Stroud told Cornelis that he had an extra twenty dollars' worth of crack cocaine, and asked Cornelis if he had an extra twenty dollars to pay for it. Officer Cornelis declined, stating that he had only enough money to pay for one hundred dollars' worth of the drug. At that point, Stroud produced a clear plastic bag containing a "yellowish, rock-like substance," *id.* at 294, and placed it in Officer Cornelis's hand. Officer Cornelis inspected the substance and then gave Stroud one hundred dollars. Stroud asked if Cornelis had

---

**1.** Ind.Code Ann. § 35–48–4–1 (West, PREM-ISE through 2002 1st Special Sess.).

"any buddies that were interested in getting more product." *Id.* at 295. Officer Cornelis replied that he did not. Stroud exited the vehicle and walked away. That conversation was recorded and the tape was entered into evidence.

Officer Cornelis drove to the MSOS office and went inside. Sergeant Michael Critchlow took a small portion of the substance that Officer Cornelis had purchased from Stroud and tested it using a NIK Field Test Kit. The substance, which weighed 1.6 grams, tested positive for cocaine. Sergeant Critchlow returned the bag and its contents to Officer Cornelis, who placed it in a clear plastic evidence bag and heat-sealed it. Officer Cornelis then placed his initials on each side of the seal.

Stroud was subsequently charged with dealing in cocaine as a class B felony and the matter proceeded to trial. While discussing preliminary matters on the morning that trial was to commence, defense counsel apprised the trial court about a newspaper article that appeared on the front page of that morning's local newspaper. Under a bold headline reading, "Stroud told to act properly during drug trial" appeared a photograph of a shackled Stroud being escorted into the courtroom on the first day of trial. *Defendant's Exhibits Binder, Defendant's Exhibit A.*[2] The article recounted the court's comments to Stroud before the jurors were brought into the courtroom. The second paragraph of the article stated, "Mindful of previous disruptive behavior in court by Stroud, who is also charged as the triggerman in the triple homicide near Lakesville, Judge William T. Means immediately informed Stroud of the court's expectations." *Id.* In addition, the lengthy article detailed examples of bizarre and disruptive behavior exhibited by Stroud in prior criminal proceedings against him, and informed the reader that he was currently serving a 50-year sentence as a result of a drug-related conviction. After calling the article to the trial court's attention, Stroud's counsel asked the court to "inquire of the jury whether they have read or heard anything about the trial when they get in so that we can see that they didn't read that." *Transcript* at 256. The court granted that request and the following colloquy ensued after the jury returned to the courtroom:

> THE COURT: I did wish to inquire whether any of you have read or seen anything in the media overnight concerning this case?
>
> (Jurors indicate affirmatively.)
>
> THE COURT: All right. I see several hands up. Let's see. Let's start with Mr. Ristow. What have you seen and read, sir?
>
> MR. RISTOW: Pardon me?
>
> THE COURT: What have you seen and/or read?
>
> MR. RISTOW: Well, in this morning's paper, I read about this gentleman over here.
>
> THE COURT: All right.
>
> MR. RISTOW: And that he's going to be on trial for possibly a murder case.
>
> THE COURT: All right. Okay. All right. And let's see. I saw Ms. Jojo's hand up.
>
> MS. JOJO: Same thing. Same article.
>
> THE COURT: Same article. And that would be then, Mrs. Ryback, also.
>
> MS. RYBACK: Same thing.
>
> THE COURT: All right. And I believe I saw Mr. Seltzer's hand up. Same thing you've read about this case in the morning paper?
>
> MR. SELTZER: Yes.

---

**2.** The pages in the *Defendant's Exhibit Binder* are not numbered.

*Transcript* at *263–64.* After the court finished questioning the jury, defense counsel submitted a motion for mistrial, arguing that the jury had been "hopelessly contaminated" by the newspaper article. *Transcript* at 265. The trial court denied the motion. At the conclusion of trial, the jury returned a verdict convicting Stroud of the charged crimes, as set out above.

### 1.

■ The State acknowledges that *Lindsey v. State,* 260 Ind. 351, 295 N.E.2d 819 (1973) provides guidance for situations where, as here, there is a possibility that a jury has been exposed to potentially prejudicial media coverage after trial commenced. The *Lindsey* court set forth the following guidelines: (1) When the court becomes aware of the possibility of improper and prejudicial publicity, it should make a determination regarding the likelihood of resulting prejudice. This determination is made by considering both the content of the publicity and the likelihood that it came to the attention of any of the jurors. *Id.* (2) If, after such an evaluation, the court determines that the risk of prejudice appears substantial, it should interrogate the jury collectively to determine who, if any, has been exposed. *Id.* If no juror was exposed, the court should instruct the jury about the hazards of such exposure and about the need for avoiding exposure to out-of-court comments about the case. (3) If any juror was exposed, the court must determine the degree of exposure and the likely effect thereof, which is done by interrogating that juror individually, i.e., outside the presence of the other jurors. Each juror so interrogated should be individually admonished. (4) After interrogating and admonishing the exposed jurors, the court should assemble and collectively admonish the rest of the jurors along the lines set out in (1) above. (5) If the imperiled party deems the above procedures insufficient to remove the peril, he should move for a mistrial. *Id.* The trial court should declare a mistrial if it believes the peril to be substantial and incurable. The decision whether to grant a mistrial under these circumstances is committed to the trial court's discretion, and we will reverse only if we are convinced that the defendant was subjected to substantial peril. *Id.*

■ When apprised of the existence of the article in the instant case, the trial court asked if any of the jurors had seen the article. Four jurors raised their hands. At that point, the trial court should have met individually with those jurors to determine the extent to which they had been contaminated. The court failed to do that. Instead, the court questioned those jurors in the presence of the other jurors. When questioned, the exposed jurors divulged to the court the nature of the material in the article. As a result, the remainder of the jury was also contaminated. Finally, it appears from the record that the trial court did not specifically admonish any of the jurors, either collectively or individually, to disregard what they had read or heard with respect to that particular article. Thus, the trial court failed to follow the procedure prescribed in *Lindsey* in two important respects. First, the court questioned the initially-exposed jurors about the content of the article in the presence of other jurors who had not read the article. That, in turn, contaminated those who had not read the article. Second, the court did not specifically admonish the jurors to disregard what they read in the article in question. The trial court concluded that the article did not taint the jury such that it placed Stroud in a position of substantial peril. It was upon that basis that the trial court denied the motion for mistrial. We

conclude that such constituted an abuse of discretion.

■ We note that the State contends that the trial court "thoroughly" admonished the jury. *Brief of Appellee* at 5. We cannot agree with that assessment. After ascertaining the extent to which the jurors were tainted by the article, the court addressed the jury as follows:

> I cannot remember at this juncture whether I took the precaution to request that you not read any articles or watch television or any other source of media, including radio or television or any other source of media, including radio to re-porting [sic] anything about this case, and it's—I say that because I wanted to stress that it's your sworn duty to con-sider only evidence that is admitted in this courtroom through testimony of wit-nesses and any exhibits that may be submitted to you for examination.
>
> The point being that any observer can have his or her own view of what is transpiring or how the proceedings are going, but you people have a sworn duty to only consider what you see and hear in this courtroom.
>
> And so I request that so far as the from this point on, that you try very hard to avoid any reporting of this in the media in any form.

*Transcript* at 264. So far as we can tell, the foregoing constitutes the entirety of the admonishment with respect to the newspaper article.[3] Although the court instructed the jury on the subject of what it *could* consider, it did not caution the

jury about the kind of information that it could *not* consider, including the informa-tion contained in the newspaper article. That distinction is critical in this context. In view of the magnitude of the taint, the court should have, at a minimum, affirma-tively instructed the jurors to disregard anything they read in the article. The fail-ure to do so rendered the court's curative comments ineffectual.

The dissent believes that the error was cured by the trial court's admonishments. We reiterate here that the admonishments, such as they were, were not specific enough to address the very specific preju-dicial material that was injected into the trial by virtue of the newspaper article. One of the two admonishments cited by the dissent was, in fact, delivered at the outset of trial along with several other general instructions, and therefore cannot be properly viewed as an admonishment in the first place. The other admonishment cited by the dissent was little more than a boilerplate pronouncement to the effect that jurors should consider only evidence presented at trial, and should disregard extraneous sources such as outside publici-ty. The court diluted the already weak curative impact of this formulaic statement by explaining that outside sources should be rejected because, among other things, "any observer can have his or her own view of what is transpiring or how the proceedings are going[.]" *Transcript* at 264. If general instructions and boiler-plate admonishments such as these are sufficient to cure an error of this magni-tude, then we are hard-pressed to imagine

---

**3.** We are aware that, a few moments later, as part of its general instructions to the jury before the State presented its case-in-chief, the court stated,

> There may be publicity in newspapers, on radio, or television concerning this trial. You should not read or listen to those ac-counts, but should confine your attention to

the court proceedings, listen attentively to the evidence as it comes from the witnesses, and reach a verdict solely upon what you hear and see in this court.

*Transcript* at 29. Such was not given as an admonition, however, and may not be so characterized after the fact. Therefore, it has no bearing on our analysis.

a scenario in which more aggressive curative steps on the trial court's part would ever be warranted.

■ The dissent is also of the view that the evidence of guilt was "overwhelming," and that in light of such evidence, the probable persuasive effect of the material in question was relatively minor and did not contribute to the guilty verdict. We agree that in most cases, our dissenting colleague's analysis would carry the day. Several factors present in the instant case, however, convince us that reversal here is required.

First, we note that the information gleaned from the articles was highly prejudicial. It informed the jury that Stroud had already been convicted of committing an offense similar to that for which he was then on trial. It informed the jury that Stroud was currently charged with an even worse crime—a triple homicide. It also informed the jury of egregious inappropriate and antisocial behavior exhibited by Stroud during previous criminal proceedings. Second, we note that this information would not have come before the jury through any other means. *Cf. Barnes v. State*, 693 N.E.2d 520, 525 (Ind.1998) (we affirmed the denial of a motion for change of venue based upon a claim that the jury pool was tainted by prejudicial media coverage, noting that the "media coverage in this case was almost completely coextensive with (and therefore cumulative of) the evidence presented at trial and did not unfairly portray [the defendant] as guilty despite frequently mentioning that he was the suspect in the case.") We are hard-pressed to imagine an example where there is a greater danger of the jury drawing the "forbidden inference," i.e., "that because of a defendant's criminal propensity, he committed the charged act." *Bald v. State*, 766 N.E.2d 1170, 1173 (Ind.2002).

Finally, we note that the jury was exposed to the newspaper article early in the proceedings—before the State had even presented its case. In this significant way, the instant case presents an even more compelling case for reversal than *Lindsey*. In *Lindsey*, the jury was exposed to the article following the conclusion of the State's case-in-chief. The court acknowledged that there may be a "natural and worthy tendency" on the part of trial courts in such circumstances to "salvage" the trial, no doubt in view of the fact that considerable time and resources have already been invested in the trial. *Lindsey v. State*, 295 N.E.2d at 823. Even under those circumstances, however, where the contamination occurred well into the trial, the court concluded that "the prime consideration of the trial judge should have been to protect the integrity of the trial and not to salvage it." *Id.* at 824. Unlike *Lindsey*, there was comparatively little to "salvage" in the instant case. The court could have selected a new jury panel at the point it learned of the contamination with a minimal loss of time and, with the exception of the initial jury selection process itself, no wasted effort. To these considerations we add our previous conclusions, viz., that the trial court failed to follow the correct procedure when the newspaper article was brought to its attention and, in so doing, further exacerbated the problem.

For all of these reasons, we conclude that the jury was irreversibly tainted by exposure to the newspaper article. Therefore, the trial court abused its discretion in denying Stroud's motion for mistrial and the conviction must be reversed.

### 2.

■ Although we have determined that Stroud's conviction must be reversed, we address his claim that the evidence was insufficient to support the conviction, because if he prevails on this claim, double

jeopardy principles bar a retrial. *Robinette v. State*, 741 N.E.2d 1162 (Ind.2001).

Our standard for reviewing claims of insufficient evidence is well settled. We consider only the evidence most favorable to the judgment, together with all reasonable inferences to be drawn from that evidence. *Green v. State*, 756 N.E.2d 496 (Ind.2001). We neither reweigh the evidence nor judge witness credibility, and will affirm upon finding substantial evidence of probative value from which the jury could find the defendant guilty beyond a reasonable doubt. *Id.*

Officer Cornelis's testimony clearly described the details of the drug purchase operation that transpired on September 1, 1998. Officer Cornelis testified that Stroud was the individual who sold him the cocaine that night. The State introduced into evidence a recorded conversation between Officer Cornelis and Stroud in which they discussed the details of the impending drug transaction. The State also introduced into evidence a recording of the drug purchase transaction in which Stroud participated. Both recordings were intelligible. In addition, the testimony of other surveillance officers who were present on that night corroborated Officer Cornelis's testimony regarding the events surrounding the drug purchase. Finally, the substance that Stroud sold to Officer Cornelis tested positive for cocaine. The aforementioned evidence was sufficient to support the conviction. Therefore, retrial on the dealing in cocaine charge does not offend principles of double jeopardy.

Judgment reversed.

NAJAM, J., concurs.

SHARPNACK, J., dissents with opinion.

SHARPNACK, Judge, dissenting.

I respectfully dissent. I agree with my colleagues that the trial court failed to follow the procedures outlined in *Lindsey v. State*, 260 Ind. 351, 295 N.E.2d 819 (1973). However, I believe on balance, the trial court's refusal to grant a mistrial was not reversible error.

First, while *Lindsey* outlines the appropriate procedure that a trial court should follow if its jurors become exposed to prejudicial, extraneous information, it is important to recognize that in *Lindsey* there was no admonishment for our supreme court to consider. There, after the State concluded its presentation of the evidence, the defendant filed a motion for mistrial because of an article that had appeared in a local newspaper the evening before. *Id.* at 354, 295 N.E.2d at 821. The trial court denied the defendant's motion for mistrial, and the jury found the defendant guilty. *Id.* at 355, 295 N.E.2d at 822. After the guilty verdict, the trial court conducted an examination of the jury regarding the article. *Id.* As a result of the examination, the trial court discovered that four of the jurors had no exposure to the article, but that eight had been exposed; however, their exposure varied from mere awareness of the article to specific knowledge derived from having read the entire article. *Id.* The trial court only questioned the two jurors who had read the entire article as to whether their exposure had influenced their decisions. *Id.* They stated, under oath, that the article did not influence them, and the verdict was permitted to stand. *Id.* Our supreme court reversed the trial court, stating in part, that:

> Upon a suggestion of improper and prejudicial publicity, the trial court should make a determination as to the likelihood of resulting prejudice, both upon the basis of the content of the publication and the likelihood of its having come to the attention of any juror. If the risk of prejudice appears substantial, as opposed to imaginary or remote only, the court should interrogate the jury

collectively to determine who, if any, has been exposed. If there has been no exposure, the court should instruct upon the hazards of such exposure and the necessity for avoiding exposure to out-of-court comment concerning the case. If any of the jurors have been exposed, he must be individually interrogated by the court outside the presence of the other jurors, to determine the degree of exposure and the likely effect thereof. After each juror is so interrogated, he should be individually admonished. . . . If the jury has been interrogated and admonished, as set forth above, the continuance of the trial, over the imperiled party's motion for a mistrial, will be reversible error only if it can be said, after giving the decision of the trial judge the benefit of all reasonable doubt, that the peril was such as to be uncurable by instruction.

*Id.* at 358–359, 295 N.E.2d at 824.

Here, as the majority indicates, the trial court did not follow the procedure outlined in *Lindsey*. Specifically, the trial court did not separately and individually interrogate the jurors.[4] Rather, it questioned the four jurors who had been directly exposed to the newspaper article in the presence of the other jurors. Because the trial court did not separately interrogate the four exposed jurors, the remaining eight jurors became indirectly exposed to the prejudicial information contained within the newspaper article. The trial court did not then interrogate the eight indirectly exposed jurors to determine whether they subsequently had formed an opinion regarding Stroud's guilt or innocence as a result of their exposure.

The majority also contends that the trial court violated the dictates of *Lindsey*, because "the trial court did not specifically admonish any of the jurors, either collectively or individually, to disregard what they had read or heard with respect to that particular article." Majority Opinion at 434. I disagree. Specifically, the trial

---

**4.** In *Dupree v. State,* we addressed the issue of whether it was reversible error for the trial court not to examine jurors individually and outside the presence of other jurors, when one juror reported hearing an inappropriate, out of court comment. 712 N.E.2d 1076, 1078–1080 (Ind.Ct.App.1999). We held that although the judge did not individually interrogate the jurors, the "[the defendant] failed to present substantial evidence of prejudice by the trial court's decision not to interrogate the jurors outside of the presence of the other jurors." *Id.* at 1080. However, the facts in this matter are distinguishable from the facts in *Dupree*. Particularly, in *Dupree*, a courthouse coffee shop employee stated that, "well, they'll never pick me for jury duty because I know everybody in the courthouse. And besides, I figure if he's charged with something and brought—if he's coming to trial, that probably means he did something." *Id.* at 1078. Here, the extraneous information contained in the newspaper article is significantly more prejudicial than the employee's comment in *Dupree*. In particular, the newspaper article contained a great deal of prejudicial information regarding Stroud's previous criminal history as well as his alleged involvement in another crime. On the other hand the employee's comment in *Dupree* was "merely the employee's opinion that if a person is charged with a crime, he must be guilty. The employee did not mention specific evidence or facts surrounding the case." *Id.* at 1079. Moreover, in *Dupree* all of the jurors were initially exposed to the extraneous information; therefore, the trial court's failure to individually interrogate the jurors was not critical. Conversely, here the trial court's failure to separately interrogate the jurors was significant, because only four of the twelve jurors had been initially exposed. Hence, while in *Dupree* we held that there was no indication that the defendant presented substantial evidence of prejudice by the trial court's action, we should not reach the same conclusion here. *See, e.g., Matthews v. State,* 476 N.E.2d 847, 852 (Ind.1985) (holding that it was proper for the trial court to individually examine a juror who was concerned about an extraneous racial issue).

court admonished the jury on two separate occasions.[5] First, the trial court admonished the entire jury after its interrogation of the four exposed jurors. Specifically, the trial court stated that it was the jury's sworn duty to "consider only evidence that is admitted in this courtroom through testimony of witnesses and any exhibits that may be submitted to [them] for examination." Transcript at 264–265. Moreover, before opening statements, the trial court admonished the jury a second time, stating in part, that:

> There may be publicity in newspapers, on radio, or television concerning this trial. You should not read or listen to these accounts, but should confine your attention to the court proceedings, listen attentively to the evidence as it comes from the witnesses, and reach a verdict solely upon what you hear and see in this court.

*Id.* at 268–269. As previously mentioned, in *Lindsey* there was no admonishment to the jury for the supreme court to specifically consider. However, our supreme court did note that where an appropriate admonishment had been given, proceeding in spite of a defendant's motion for a mistrial would "be reversible error only if it can be said, . . . that the peril was such as to be uncurable by instruction." *Id.* at 359, 295 N.E.2d at 824.

Our supreme court has held on several occasions that an admonishment is considered sufficient to cure an alleged error and, thereby, protect a defendant's rights. *Dixon v. State,* 524 N.E.2d 2, 4 (Ind.1988). For example, in *Dixon,* the defendant moved for a mistrial because after the first day of trial, a juror saw a local newspaper article stating that the defendant was on trial for burglary. *Id.* Specifically, the article stated that the defendant faced an enhanced fifty-year sentence and designation as an habitual offender. *Id.* The trial court questioned the juror individually and found that any prejudice that might have arisen in the mind of the juror who had a minimal exposure to the news story about the defendant was insufficient to warrant a mistrial. *Id.* The judge then admonished the entire jury to disregard the independent interrogation of the juror and avoid contact with outside sources. *Id.* The admonishment was presumed to cure any error unless the contrary was shown. *Id.* Our supreme court ultimately held that the trial judge properly denied the defendant's motion for mistrial. *Id.; see also Bradley v. State,* 649 N.E.2d 100, 107 (Ind.1995) (affirming the trial court's denial of defendant's request for a mistrial and stating that reversible error is seldom found when the trial court has admonished the jury to disregard a statement made during the proceedings), *reh'g denied; Schlomer v. State,* 580 N.E.2d 950, 956 (Ind.1991) (stating that "usually an admonishment to the jury is considered adequately curative and will support the trial judge in his denial of a motion for a mistrial").

Whether peril is of enough substance to be uncurable by instruction is determined by the probable persuasive effect of the prejudicial information. *See Schlomer,* 580 N.E.2d at 955. Here, although the information contained within the newspaper article was prejudicial, there was overwhelming clear evidence of Stroud's guilt, making it improbable that his conviction resulted from any of the publicity to which the jury had been exposed and which it

---

5. The majority considers the preliminary instruction given by the court as having "no bearing" on the analysis of the case because it "was not given as an admonition." Majority Opinion at 435 n. 3. In the context of this case, I believe the preliminary instruction must be considered as an "admonition;" or, perhaps rather, it cannot be ignored in assessing the overall impact of what the trial court did.

had been instructed to ignore. Officer Cornelis's testimony clearly described the details of the drug purchase operation that took place on September 1, 1998. Officer Cornelis testified that Stroud was the individual who sold him cocaine that night. The State admitted into evidence a recorded conversation between Officer Cornelis and Stroud, wherein they discussed when and where the drug transaction would take place. The State also admitted into evidence a recording of the actual drug purchase transaction. Other surveillance officers who were present the night of September 1, 1998, also testified at trial and corroborated Officer Cornelis's testimony regarding the events surrounding the drug purchase operation. Further, the substance that Stroud sold to Officer Cornelis tested positive for cocaine. *See, e.g., Schlomer,* 580 N.E.2d at 956 (discussing the "overwhelming evidence" against the defendant).

Thus, the trial court did admonish the jury to ignore the media information and base their decision upon the evidence, which in this case is overwhelming. Stroud has not shown that the peril to which he was exposed by the juror's exposure to the media information was "such as to be uncurable by instruction." *Lindsey,* 260 Ind. at 359, 295 N.E.2d at 824. I, therefore, conclude that the trial court did not err by denying a mistrial and would affirm Stroud's conviction for dealing in cocaine as a class B felony.