**Gary Dennis JACKSON, Appellant–Defendant,**

v.

**STATE of Indiana, Appellee–Plaintiff.**

No. 39A01–0711–CR–528.

Court of Appeals of Indiana.

March 31, 2009.

Transfer Granted July 2, 2009.

Jason J. Pattison, Jenner Auxier & Pattison, LLP, Madison, IN, Attorney for Appellant.

Gregory F. Zoeller, Attorney General of Indiana, Joby Jerrells, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

RILEY, Judge.

### STATEMENT OF THE CASE

Appellant–Defendant, Gary Dennis Jackson (Jackson), appeals his conviction for battery resulting in serious bodily injury, a Class C felony, Ind.Code § 35–42–2–1(a)(3).

We reverse.

### ISSUES

Jackson raises four issues for our review, two of which we find dispositive and restate as:[1]

(1) Whether the trial court abused its discretion by granting the State a mistrial; and

(2) Whether the trial court violated the prohibition against double jeopardy by submitting Jackson to a trial subsequent to the mistrial it granted the State.

### FACTS AND PROCEDURAL HISTORY

On September 11, 2006, Jackson, Gerald "Bubby" Roberts (Roberts), Garry Campbell (Campbell), Tim High (High), and Ben Smith (Smith) were drinking vodka at Smith's apartment on Walnut Street in Madison, Indiana. Jackson confronted Roberts about whether he had stolen some liquor, cigarettes, and money from him the night before. Eventually Jackson started punching Roberts. Roberts fell to a mattress lying on the floor and Jackson kept hitting him, as well as kicking him and stomping on him. During the beating, Roberts pleaded with Jackson to stop, but by the end of the beating he was not talking anymore. The men at the apartment checked Roberts and decided he was not hurt bad enough to call for an ambulance because he was coughing from time to time. Jackson and High each left the apartment just before dark.

Early the next morning, Smith woke up when Roberts was having a seizure. Roberts was epileptic and did not take medication for his epilepsy, so he periodically had seizures. Smith noticed fresh blood on the wall and that Roberts was bleeding from the mouth. Smith wiped the blood off of Roberts' face and started drinking vodka. That morning someone that Smith had met at Jackson's residence came over to clean Smith's apartment as they had previously arranged.[2] Smith, Campbell, and the cleaning guy decided that Roberts looked pretty bad and was now in need of an ambulance. Smith and the cleaning guy drank some vodka and then left to go buy some cleaning products and told Campbell that they would call an ambulance while they were gone. When they

---

1. Jackson originally raised six issues on appeal. However, two of those issues were resolved by the trial court when this appeal was stayed and this case was remanded for post conviction relief proceedings. We resumed jurisdiction over this appeal and will review the remaining issues.

2. Smith could not remember this individual's name at trial.

returned Campbell learned that they had not called for an ambulance. Campbell then left to call an ambulance for Roberts. Smith and the cleaning guy stayed and drank some more vodka.

The paramedics arrived and Roberts was pronounced dead at 12:04 p.m. During an autopsy, it was determined that Roberts had sustained a traumatic brain injury eight hours and twenty minutes before he died. The cause of death was blunt force trauma to Roberts' head.

On September 19, 2006, the State filed an Information charging Jackson with aggravated battery, a Class B felony, I.C. § 35-42-2-1.5. On October 26, 2006, the State filed an additional Information charging Jackson as being an habitual offender. Jackson was tried by jury on December 8 through December 15, 2006.[3] That trial resulted in a hung jury, and a mistrial was declared.

A second jury trial was scheduled and a jury was sworn and impaneled on April 23, 2007. That same day, a local newspaper ran an article about the trial which contained an excerpt from a letter Jackson had written to Jefferson County's chief deputy prosecutor. Jackson was quoted as writing "I know my life to you doesn't mean anything, just another poor black man the [S]tate can clean up the book on." (State's Exhibit 1). First thing the next morning, the State requested a mistrial. The trial court asked the jury if any members knew of the article and five acknowledged they did. The trial court then held voir dire with each of those five jurors individually to determine what they knew about the newspaper article.[4] The first juror questioned stated that he saw the article and read the first couple of sentences, but remembered that he had been instructed to stay away from newspaper articles or radio coverage of the trial, and stopped reading. He testified that what he read would not influence his determination of guilt or innocence. The second juror that was questioned stated that he read the article. He stated that he did not know the facts of the case and the article did not influence him to lean toward either side. The third juror questioned stated that his wife started reading the article aloud, but he told her to stop. He only heard something about the fact that a jury was being selected. He testified that he was not influenced by what he heard. The fourth juror stated that her husband started reading the article but she told him to stop. Her husband stopped reading, but told her he knew "that person in [the] article." (Transcript p. xiv). She testified that she heard nothing that would cause her to form an opinion either way, and that her husband knowing Roberts would not influence her either. The fifth and final juror who knew of the article stated that he had read the article. He testified that the part about the letter to the chief deputy prosecutor meant nothing to him because he did not know the facts of the case. He said the article would not influence him in any way. After voir dire and taking argument from the State and Jack-

---

3. Jackson's attorney has omitted certain pages in the Appellant's Appendix, including the pages that are cited in the Appellant's Brief as containing portions of the CCS entries regarding Jackson's first jury trial. However, it is undisputed that Jackson's first jury trial resulted in mistrial, and Jackson does not raise any issues regarding the first mistrial.

4. The Transcript represents that the voir dire regarding the article took place on April 23, 2007. However, this must be inaccurate because the text of the Transcript refers specifically to "a short article ... yesterday." (Transcript p. iii). The article ran on April 23, 2007; therefore the individual voir dire must have taken place on April 24, 2007.

son, the trial court stated that it believed Jackson when he represented that he had nothing to do with the newspaper article, and that it believed the State's denial of prejudice towards Jackson. The trial court then added, "That's not my issue in my head," and granted the State's motion for a mistrial. (Tr. p. xxi).

On June 25, 2007, a third jury was impaneled for a trial, and the trial commenced the next day. On July 6, 2007, the trial court returned a verdict finding Jackson guilty of battery resulting in serious bodily injury, as a Class C felony, I.C. § 35–42–2–l(a)(3); battery, as a Class A misdemeanor, I.C. § 35–42–2–l(a)(*l*); and battery, as a Class B misdemeanor, I.C. § 35–42–2–1, all as lesser included offenses of the charged crime aggravated battery, a Class B felony. The trial court entered a judgment of conviction on the battery resulting in serious bodily injury verdict and merged the verdicts on the two misdemeanor battery charges into that conviction. On July 16, 2007, after a series of motions by Jackson and the State, the trial court found Jackson to be an habitual offender. On July 26, 2007, the trial court sentenced Jackson to twenty years with the Department of Correction. Jackson initiated a timely appeal, but on September 9, 2008, Jackson requested that his appeal be stayed so that he could pursue post-conviction relief, which we granted. On December 15, 2008, Jackson filed a Petition for post-conviction relief alleging that the trial court's finding that he was a habitual offender was improper. The trial court agreed, and on December 29, 2008, entered an Order vacating the habitual offender finding, which the State of Indiana has not appealed. On February 20, 2009, Jackson requested that we resume jurisdiction over his previously filed appeal, and on March 3, 2009, we issued an Order resuming jurisdiction.

Jackson now appeals his conviction for battery resulting in serious bodily injury. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

### I. Did the Publication Justify a Mistrial?

■ Jackson first argues that the trial court abused its discretion when it declared a mistrial at the second jury trial. Specifically, he contends that for the trial court to have properly declared a mistrial, it must first have found that the jurors were influenced by the newspaper article which prompted the State to move for the mistrial, but it did not.

■ Before addressing Jackson's contention, we address the State's contention that Jackson has waived this issue for review by failing to object to the grant of the mistrial. Although Jackson's attorney never uttered the words "I object," he did explain to the trial court that all of the jurors questioned about reading the article have "indicated it has not had any impact upon their ability to be fair and impartial jurors in this case, and for that reason we believe a mistrial would not be appropriate." (Tr. pp. xix-xx). We conclude that this is a sufficient objection to preserve this issue for appeal. *See Chambers v. State*, 848 N.E.2d 298, 302 (Ind.Ct.App. 2006), *trans. denied* (holding statement to trial court that case was set as speedy trial to be a sufficient to preserve issue of whether right to speedy trial was violated although the specific word "object" or "objection" was not used when State moved for continuance).

■ Moving on to address the propriety of the mistrial, we note that when instances of trial publicity and the trial court's ruling on a motion for mistrial are presented on appeal, the typical circum-

stance involves a defendant who has moved for a mistrial and the denial of that motion. *See, e.g., Harris v. State,* 249 Ind. 681, 231 N.E.2d 800 (1967), *Lindsey v. State,* 260 Ind. 351, 295 N.E.2d 819 (1973), *Kimmel v. State,* 275 Ind. 575, 418 N.E.2d 1152 (1981), *Dupree v. State,* 712 N.E.2d 1076 (Ind.Ct.App.1999), *Stroud v. State,* 787 N.E.2d 430 (Ind.Ct.App.2003). The fact that a juror has read a newspaper article pertaining to a case is not grounds for a mistrial, new trial, or reversal unless it is shown that the jurors were influenced thereby. *Harris,* 249 Ind. at 695, 231 N.E.2d at 807. In *Stroud,* we explained:

> The *Lindsey* court set forth the following guidelines: (1) When the court becomes aware of the possibility of improper and prejudicial publicity, it should make a determination regarding the likelihood of resulting prejudice. This determination is made by considering both the content of the publicity and the likelihood that it came to the attention of any of the jurors. (2) If, after such an evaluation, the court determines that the risk of prejudice appears substantial, it should interrogate the jury collectively to determine who, if any, has been exposed. If no juror was exposed, the court should instruct the jury about the hazards of such exposure and about the need for avoiding exposure to out-of-court comments about the case. (3) If any juror was exposed, the court must determine the degree of exposure and the likely effect thereof, which is done by interrogating that juror individually, i.e., outside the presence of the other jurors. Each juror so interrogated should be individually admonished. (4) After interrogating and admonishing the exposed jurors, the court should assemble and collectively admonish the rest of the jurors along the lines set out in (1) above. (5) If the imperiled party deems the above procedures insufficient to re-

move the peril, he should move for a mistrial. The trial court should declare a mistrial if it believes the peril to be substantial and incurable.

*Stroud,* 787 N.E.2d at 434. That being said, a trial court's ruling on a mistrial is given great deference by the appellate courts because a trial court is in the best position to evaluate the circumstances and their probable impact on the jury. *Pavey v. State,* 764 N.E.2d 692, 700 (Ind.Ct.App. 2002), *trans. denied.* Still, a mistrial is an extreme remedy in a criminal case and should be granted only when nothing else can rectify the situation. *State v. Glasscock,* 759 N.E.2d 1170, 1173 (Ind.Ct.App. 2001).

Here, the trial court appropriately questioned the jury to ascertain who was aware of the article, and then properly questioned the jurors that were aware of the article individually. The trial court learned that five jurors were aware of the article, and two the jurors had read it in its entirety. None of the jurors stated that the article would influence their decision. Only one juror specifically indicated that he remembered the passage with the quote from Jackson's letter to the prosecutor, and he assured the trial court that the passage would have no effect on his consideration of the case. The trial court did not admonish the jurors individually or collectively, but rather determined that a mistrial was appropriate.

The trial court did not state on the record why an admonition would have been insufficient, or why it believed that the article jeopardized the State's case. Moreover, there is no evidence on the record that the State's case was jeopardized as no juror testified that they were even remotely influenced by the article. It is true that a trial judge, who sees the demeanor of witnesses, can scrutinize their testimony in a way that we cannot when

reviewing a "cold transcript." *Kirk v. Kirk,* 770 N.E.2d 304, 307 (Ind.2002). As such, if the trial court had explained that it had perceived a nonverbal indication of bias from a juror who had been exposed to the article, we may have concluded that the mistrial had been appropriately granted. But, the trial court's only statement for the record as to why the mistrial ruling was justified was "That's not my issue in my head." (Tr. p. xxi). Therefore, we conclude that an admonition from the trial court would have been sufficient considering the limited nature of the jury's exposure to the passage from the article and lack of evidence that the article influenced any juror. As such, the trial court abused its discretion by granting the mistrial.

## II. *Double Jeopardy*

In a closely related argument, Jackson contends that the trial court violated his right to be free from double jeopardy by inappropriately granting a mistrial and then allowing a subsequent trial on the same charges. Specifically, Jackson argues that there was no manifest necessity to grant the mistrial, and therefore the discharge of the jury without his consent prohibited another trial.

The Fifth Amendment to the Constitution of the United States provides in pertinent part: "Nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb . . . ." This provision is made applicable to the States through the Due Process Clause of the Fourteenth Amendment. *Crim v. State,* 156 Ind.App. 66, 75, 294 N.E.2d 822, 829 (1973). Article 1, Section 14, of the Constitution of the State of Indiana provides in pertinent part: "No person shall be put in jeopardy twice for the same offense." Under both the Indiana and Federal Constitutions, jeopardy attaches when a criminal trial commences, and this point arrives when a jury has been selected and sworn

even though no evidence has been taken. *Crim,* 294 N.E.2d at 828. The defendant has a valued right to have his trial completed by a particular tribunal. *Glasscock,* 759 N.E.2d at 1173. Since the jury had been sworn, jeopardy had attached to Jackson's second trial despite the fact that not even the opening statements had yet been delivered to the jury.

Once jeopardy has attached, the trial court may not grant a mistrial over a defendant's objection unless "manifest necessity" for the mistrial is found. *Brown v. State,* 703 N.E.2d 1010, 1015 (Ind.1998) (citing *Arizona v. Washington,* 434 U.S. 497, 505, 98 S.Ct. 824, 54 L.Ed.2d 717 (1978)). In the absence of manifest necessity, the discharge of the jury operates as an acquittal. *Brown,* 703 N.E.2d at 1015 (citing *Wright v. State,* 593 N.E.2d 1192, 1196 (Ind.1992)).

The words "manifest necessity" do not describe a standard that can be applied mechanically or without attention to the particular problem confronting the trial judge. *Id.* We have previously said that manifest necessity contemplates a sudden and overwhelming emergency beyond the control of the court. *Glasscock,* 759 N.E.2d at 1173. Manifest necessity is not absolute necessity; there need only be a "high degree" of necessity before concluding that a mistrial is appropriate. *Brown,* 703 N.E.2d at 1015. An explicit finding of manifest necessity is not required; rather, the record need only adequately disclose the basis for the trial court's decision. *Id.* The decision of the trial court to grant a mistrial will be reversed only for an abuse of discretion, with "manifest necessity" as the benchmark. *Id.*

When directly questioned, no juror testified that the article had even the slightest influence on their ability to be conscien-

tious arbiters. Moreover, we have concluded that an admonishment from the trial court would have sufficiently cured any potential prejudice caused by the jury's limited exposure to the article. For that same reason, there was no manifest necessity to grant the mistrial, and the trial court abused its discretion by doing so. Therefore, we conclude that the discharge of the jury at Jackson's second trial operated as an acquittal and the subsequent trial of Jackson was a violation of his right to be free from double jeopardy.

## CONCLUSION

Based on the foregoing, we conclude there was no evidence that the jury was influenced by the newspaper article, and, therefore, there was no manifest necessity to grant such a mistrial. Consequently, the dismissal of the jury at Jackson's second trial operated as an acquittal, and the subsequent trial on those same charges violated his right to be free from double jeopardy.

Reversed.

BAILEY, J., concurs.

BRADFORD, J., dissents with separate opinion.

BRADFORD, Judge, dissenting.

In my view, the trial court was within its considerable discretion to conclude that a manifest necessity existed to justify a mistrial and permit retrial in the instant case without violating Jackson's double jeopardy protections. For this reason, I respectfully dissent. In addition, I conclude that Jackson's challenges to the exclusion of certain evidence and to the sufficiency of the evidence to convict him are without merit. Accordingly, I would affirm Jackson's conviction for Class C felony Battery Resulting in Serious Bodily Injury.

## I. Double Jeopardy

The majority employs a two-part analysis, the first part of which concludes that the trial court abused its discretion in granting a mistrial based largely on the fact that an admonition could have been curative. As I see it, the single dispositive issue in Jackson's double jeopardy claim is whether the mistrial was justified on "manifest necessity" grounds. Once jeopardy attaches, the trial court may not grant a mistrial over a defendant's objection unless "manifest necessity" for the mistrial is found. *Brown v. State,* 703 N.E.2d 1010, 1015 (Ind.1998) (citing *Arizona v. Washington,* 434 U.S. 497, 505, 98 S.Ct. 824, 54 L.Ed.2d 717 (1978)).

Significantly, the availability and use of an admonition or other remedial language is not necessarily a determining factor under the "manifest necessity" analysis. Indeed, a "manifest necessity" justifying mistrial may be found irrespective of whether such an admonition was requested or given. *See Arizona,* 434 U.S. at 511, 98 S.Ct. 824 (acknowledging that cautionary instructions were not given and that mistrial not "necessary" in strict literal sense but nevertheless affirming trial court's grant of mistrial on "manifest necessity" grounds). The Indiana Supreme Court, adopting the United States Supreme Court's broad conception of "manifest necessity" in *Arizona,* has emphasized that "necessity" is "not to be interpreted literally" and that there need only be a "high degree" of necessity to justify a mistrial and permit retrial without violating double jeopardy. *Brown,* 703 N.E.2d at 1015 (citing *Arizona,* 434 U.S. at 506, 98 S.Ct. 824). I am therefore unpersuaded by the majority's reasoning that the absence of an admonition in the instant case was fatal to the State's eligibility for a mistrial.

Of additional significance, when evaluating whether this "high degree" of necessity

exists, the Indiana Supreme Court places great importance upon the extent to which the State is responsible for the circumstances leading to the mistrial. In *Brown*, the Supreme Court affirmed the trial court's granting the State a mistrial on "manifest necessity" grounds based largely upon the fact that the State was not responsible for, nor had any part in, creating the circumstances leading it to request a mistrial. 703 N.E.2d at 1015–17. The facts in *Brown* involved the State's request for a mistrial after a juror revealed, following opening argument and attachment of jeopardy, that his role as a minister at a local jail would affect his ability to be an impartial juror by compromising his ministerial position and potentially his safety. *Id.* at 1014–15. The *Brown* court first determined that the presence of a juror with such concerns presented a structural impediment to a fair trial. *Id.* at 1016. The court then determined, based upon the State's questions and this juror's answers during voir dire, that the State could not be held accountable for failing to divine the unsuitability of this juror. *Id.* at 1017. On these grounds, and with great deference to the trial court due to its superior position to evaluate the "gravity of the impediment," the *Brown* court affirmed the existence of a "manifest necessity" warranting a new trial. *Id.*

Here, the record reveals that, through no action or fault by the State, five jurors were exposed to a newspaper article exhibiting the defendant's view that he was "another" victim of the State, largely due to the highly charged issues of his race and economic status. Two of the jurors read the article in its entirety. One of them suggested he would have difficulty judging somebody, and that he might "hurt the situation" and "hold up the process." Tr. p. ix. Based upon this evidence, the prosecutor argued that the State's case was irretrievably compro-

mised, both because the prosecutor had been branded a racist and because Jackson had been permitted to allege unfairness by the State without risk of cross-examination. Although the jurors had reassured the court that they had not been influenced by the article, the trial court was not required to accept their claims on this point.

The trial court heard and observed the jurors' voir dire examination, and it was in a superior position to evaluate the article's influence on the jury. In granting mistrial, the trial court credited the State's claim that its case had been compromised in the eyes of the jurors. In deference to this factual assessment by the trial court, I am compelled to conclude that the jurors' exposure to the article presented a structural impediment to a fair trial. *See Arizona*, 434 U.S. at 512, 98 S.Ct. 824 (citing *Simmons v. United States*, 142 U.S. 148, 12 S.Ct. 171, 35 L.Ed. 968 (1891)) (endorsing great deference to a trial judge's assessment of juror bias, and grant of mistrial, due to a newspaper article even in circumstances where the court did not examine the jurors to determine whether they had been improperly influenced). Furthermore, no part of Jackson's letter or the publication thereof was attributable to actions or neglect by the State, and given the timing of the request for mistrial before the introduction of evidence, the State cannot have been said to be seeking a more favorable opportunity to convict. Given the structural impediment presented by the jurors' exposure to the article, the State's lack of responsibility, and my great deference to the trial court, I would affirm the trial court on the grounds that a "high degree" of necessity existed justifying the State's request for mistrial such that retrial did not violate double jeopardy.

In reaching this conclusion, I am satisfied that the record, as elucidated by de-

tailed arguments by counsel, adequately discloses the basis of the trial court's decision. *See Arizona*, 434 U.S. at 516–17, 98 S.Ct. 824, *cited in Brown*, 703 N.E.2d at 1015 (observing that the record need not include an "explicit finding" of manifest necessity, that it need only "adequately disclose" the basis for the trial court's decision, and that extensive argument by counsel may be used to inform the reviewing court of the trial court's decision).

## II. Exclusion of Evidence

Jackson claims that the trial court erred when it refused to allow testimony from EMT Ronald Bennett concerning an alleged statement made by one of the men in the apartment that Roberts had jumped up, yelled something, fallen down, and hit his head against the wall. Jackson alleges that the statement was admissible either as a statement for the purposes of medical diagnosis or treatment under Indiana Evidence Rule 803(4) or as a prior inconsistent statement for impeachment purposes under Indiana Evidence Rule 613.

The admission of evidence is left to the sound discretion of the trial court, and this court will not reverse that decision absent an abuse of discretion. *Weis v. State*, 825 N.E.2d 896, 900 (Ind.Ct.App.2005). An abuse of discretion occurs when the trial court's decision is against the logic and effect of the facts and circumstances before it. *Id.*

Under Rule 803(4), otherwise inadmissible hearsay may be admitted if it consists of statements made for the purposes of medical diagnosis or treatment. This hearsay exception is based upon the belief that a declarant's self-interest in seeking medical treatment renders it unlikely that the declarant will mislead the person he wants to treat him. *McClain v. State*, 675 N.E.2d 329, 331 (Ind.1996). In determining whether a statement is admissible pursuant to this rule, courts consider (1) whether the declarant is motivated to provide truthful information in order to promote diagnosis and treatment, and (2) whether the content of the statement is such that an expert in the field would reasonably rely upon it in rendering diagnosis and treatment. *Id.*

Here, neither the purpose of the rule nor its test is satisfied. To the extent the statement was for purposes of medical treatment, it was allegedly for the treatment of Roberts, who was not the declarant. There was no self-interest at stake in the declarant's statement and thus no inherent reliability under Rule 803(4). Accordingly, Rule 803(4) provides no relief.

Jackson also claims that the statement is admissible as a prior inconsistent statement under Rule 613. A prior inconsistent statement may be used to impeach a witness, and when it is used in this manner, it is not hearsay because the statement is not used to prove the truth of the matter asserted. *Martin v. State*, 736 N.E.2d 1213, 1217 (Ind.2000). Here, Jackson sought to introduce Bennett's statement for purposes of impeaching Marcus Ben Smith's testimony that he had not made this statement. Yet Bennett could not identify Smith as the declarant, so the trial court was within its discretion to exclude the statement as improper impeachment evidence. Accordingly, Rule 613 provides no relief, and the trial court was within its discretion to exclude Bennett's statement.

## III. Sufficiency of the Evidence

Jackson challenges the sufficiency of the evidence to support his conviction for Class C felony battery resulting in serious bodily injury. In making this argument, Jackson claims that the evidence fails to implicate him as the perpetrator of Roberts' serious bodily injury. Our standard of review for sufficiency-of-the-evidence claims is well-settled. We do not reweigh

the evidence or judge the credibility of the witnesses. *Kien v. State,* 782 N.E.2d 398, 407 (Ind.Ct.App.2003), *trans. denied.* We consider only the evidence which supports the conviction and any reasonable inferences which the trier of fact may have drawn from the evidence. *Id.* We will affirm the conviction if there is substantial evidence of probative value from which a reasonable trier of fact could have drawn the conclusion that the defendant was guilty of the crime charged beyond a reasonable doubt. *Id.* It is the function of the trier of fact to resolve conflicts of testimony and to determine the weight of the evidence and the credibility of the witnesses. *Jones v. State,* 701 N.E.2d 863, 867 (Ind.Ct.App.1998).

To convict Jackson of Class C felony battery, the State was required to prove, pursuant to Indiana Code section 35–42–2–1(a)(3), that Jackson knowingly or intentionally touched Roberts in a rude, insolent, or angry manner resulting in serious bodily injury. Here, Smith testified that Jackson was very angry with Roberts because Roberts had taken Jackson's liquor, cigarettes, and money, and that Jackson had vowed to "whoop" Roberts. Tr. p. 783. Smith saw Jackson hit Roberts in the face and cause Roberts to fall down. Smith, Timothy High, and Garry Campbell saw Jackson continuously beat Roberts with his fist and kick him repeatedly, while wearing boots, in the stomach and head. When Jackson finished, Roberts was bleeding significantly, at least partly from his mouth, and he was not fighting back. Roberts ultimately died, which according to forensic pathologist Dr. William Ralston was due to a blunt force trauma to the head. This evidence and all reasonable inferences therefrom are sufficient to support Jackson's conviction for Class C felony battery beyond a reasonable doubt.

For all of the foregoing reasons, I would affirm Jackson's conviction.